GROSSINGER MOTORCORP, INC., Plaintiff-Appellant and Cross-Appellee, v. AMERICAN NATIONAL BANK AND TRUST COMPANY, Defendant (4545 Touhy Company, Defendant-Appellee and Cross-Appellant).

First District (5th Division)   No. 1—91—1376

Opinion filed December 31, 1992.—Rehearing denied February 5, 1993.

---

*Justice Linn participated in this disposition prior to his retirement.

Rudnick & Wolfe, of Chicago (Mark L. Shapiro and Richard S. Huszagh, of counsel), for appellant.

Pretzel & Stouffer, Chartered, of Chicago (Robert Marc Chemers and Scott O. Reed, of counsel), for appellee.

JUSTICE GORDON delivered the opinion of the court:

Plaintiff, an automobile dealership, entered into a contract to purchase a tract of land from defendant-appellee 4545 Touhy Company (hereinafter defendant) and pursuant to this contract deposited $100,000 earnest money into an escrow. The contract contained the condition that the property be rezoned for its use as an automobile dealership and imposed the duty of diligently pursuing such rezoning on plaintiff. After failing to obtain the rezoning within the allotted period of time, plaintiff notified defendant that it was exercising its right to terminate the contract and subsequently brought this action seeking return of the earnest money. After a bench trial, the trial

court awarded defendant the earnest money as liquidated damages, pursuant to a clause in the contract, reasoning that plaintiff had breached the contract by failing to diligently pursue the rezoning of the property. The court also awarded attorney fees to defendant pursuant to a provision in the contract. Plaintiff appeals from the orders awarding defendant the earnest money and attorney fees. Defendant cross-appeals from the order awarding fees contending that the amount was inadequate.

## FACTS

### WRITTEN EVIDENCE

On October 16, 1987, plaintiff, Grossinger Motorcorp, Inc., and defendant, 4545 Touhy Co., entered into a contract for the sale of land located at 4545 W. Touhy Ave. in Lincolnwood, Illinois, for $4,750,000. Pursuant to the terms of the contract, plaintiff deposited $100,000 earnest money into an escrow. Plaintiff, a franchised motor vehicle dealer for Cadillac, Pontiac, GMC Truck, General Motors, Volvo and Suzuki, intended to use this property to consolidate some of its car dealerships, then at different locations, into an "autoplex" or automobile mall where customers could come and shop for cars from different manufacturers.

The contract contained several conditions which had to be met within specified time limits. The contract provided that by December 14, 1987, plaintiff had to receive a firm written commitment from Commonwealth Edison to lease it the strip of land adjacent to the subject property for parking on substantially the same terms and conditions as provided in Commonwealth Edison's lease with defendant. The contract also provided that by February 15, 1988, the "real estate shall be lawfully zoned for conduct of a complete automobile sales, servicing and repairing business" and that the "Village of Lincolnwood and all other applicable governmental agencies shall have issued all necessary permits and approvals for the renovation and use of the real estate in accordance with Purchaser's proposed plans therefore [sic]." Under the contract, plaintiff was required to "diligently pursue the satisfaction of each of the foregoing conditions."

If these conditions were not satisfied within the allotted time, upon plaintiff's notification to defendant, the contract would become null and void, requiring the return of plaintiff's earnest money. However, defendant had "the right *** to attempt to satisfy any of the conditions *** until the scheduled closing date of this transaction,"

February 29, 1988, by sending written notice to plaintiff within 10 days of receiving plaintiff's notification.

The contract further provided that if the termination was attributable to plaintiff, then "the earnest money shall be forfeited to the [defendant] to be retained by the [defendant] as liquidated damages, or at [defendant]'s option, [defendant] may exercise any other remedy available at law." Lastly, the contract provided that "[i]n the event of any litigation arising hereunder, the unsuccessful party shall pay the reasonable attorney's fees of the prevailing party."

Procedurally, in order to obtain rezoning, plaintiff first had to present its rezoning plan to the Plan Commission and Zoning Board of Appeals of the Village of Lincolnwood (Plan Commission), which would issue an advisory recommendation, and then to the Board of Trustees of the Village of Lincolnwood (Village Board), which would issue the final approval. Plaintiff filed its application for rezoning with the village on December 21, 1987. Plaintiff scheduled the presentation of its rezoning application before the Plan Commission for January 26, 1988. It could not proceed on that date upon discovering that proper notice of the hearing was not sent to affected residents by its counsel or by the village. As a result, the hearing was rescheduled for February 23, 1988.

In a letter to defendant dated January 28, 1988, plaintiff requested a 30-day extension to satisfy the zoning conditions and a new closing date of March 31, 1988. On February 15, 1988, defendant extended the period of time for plaintiff to obtain the rezoning from February 15, 1988, to February 29, 1988. On February 23, 1988, plaintiff presented its plan before the Plan Commission and the hearing was then continued until March 1, 1988, in order to allow comments from the public. Plaintiff informed defendant by letter dated February 24, 1988, that during the normal course of events the ordinance would not be adopted until the April 7, 1988, meeting of the Village Board. In that letter, plaintiff stated that "[o]bviously, we intend to pursue every means available to us to persuade the Village Board to finalize its action at the March 17, 1988, meeting" (the next practicable date upon which the Village Board was routinely scheduled to meet).

On February 29, 1988, plaintiff notified defendant by letter that the zoning conditions would not be satisfied in the allotted period of time and that the contract was therefore null and void. On the same date, defendant extended the time to obtain rezoning from February 29, 1988, to March 4, 1988, and extended the closing date from February 29, 1988, to March 15, 1988. On March 1, 1988, plaintiff ac-

knowledged receipt of defendant's extension and revoked its notification of February 29, 1988, agreeing that the contract was in "full force and effect."

On March 1, 1988, the Plan Commission approved the proposed rezoning plan with certain modifications to which plaintiff had previously acquiesced. The commission, however, also extended these modifications by eliminating a proposed exit from the rear of the building onto Kilbourn Ave. and a used car sign in the front of the building. On March 4, 1988, plaintiff notified defendant that the zoning conditions had not been satisfied and therefore the contract was null and void.

On March 8, 1988, defendant sent a letter to plaintiff which stated that in view of the Plan Commission's recommendation and its earlier letter from plaintiff in which plaintiff stated that it intended to pursue the matter at the March 17, 1988, board meeting, defendant expected plaintiff to request a further extension. The letter also stated that defendant thought the contract could be closed promptly if the plan were presented to the Village Board and asked for plaintiff's cooperation in this effort. In a follow-up letter dated March 10, 1988, defendant specifically asked for plaintiff's cooperation in providing the services of its architect, zoning attorney, and other personnel at the next board meeting because it would be impossible to make the presentation on March 17, 1988, without such assistance.

In reply, by letter dated March 11, 1988, plaintiff reiterated the March 15, 1988, closing date and stated that it would continue to cooperate in good faith to the full extent required under the contract. In a letter dated March 14, 1988, defendant responded that it intended to exercise its right to satisfy the zoning conditions and requested plaintiff's assistance at the forthcoming March 17, 1988, meeting. Defendant subsequently informed the chairman of the Plan Commission, Zave Gussin, that it would attempt to obtain the board's approval at the March 17, 1988, meeting. Plaintiff's zoning personnel did not attend the March 17, 1988, meeting.

On March 16, 1988, plaintiff filed a complaint for declaratory and injunctive relief seeking the return of its earnest money and reasonable attorney fees pursuant to the provision in the contract. On April 4, 1988, defendant filed a counterclaim alleging that plaintiff had failed to act diligently and in a timely fashion to obtain rezoning and had failed to cooperate in good faith with defendant's effort to obtain rezoning. In its prayer for relief, defendant asked in the alternative for the earnest money or "other remedies at law," including the difference between the "value" and contract price of the property and

all additional expenses which may result from a subsequent sale of the property.

On June 7, 1989, defendant filed an amended prayer for relief seeking only the liquidated damages and the attorney fees. It was subsequently learned that defendant had resold the subject property for $6 million, $1,250,000 more than plaintiff was to pay for the property.

### TESTIMONIAL EVIDENCE

A bench trial was held in April of 1990. Plaintiff first called Irwin Grossinger, president of plaintiff corporation. He stated, among other things, that each of his dealership agreements contained specific guidelines in the areas of sales, customer parking, storage and service which had to be met before the franchises could be relocated.

Grossinger stated that after discussing the acquisition of defendant's property in August 1987, he contacted his architect and retained Michael Downing, an experienced zoning attorney. On October 16, 1987, plaintiff and defendant entered into a contract for the sale of the land. Grossinger said that prior to the execution of this contract, the architect did some preliminary layouts and site plans.

Grossinger further testified that he was informed by the village after the execution of the contract that plaintiff would have to complete traffic impact, sewer and water engineering, and environmental studies. He stated that at this time he also retained a landscaping service and an engineering company for the sewer and water study. This process took longer than he expected. Grossinger obtained conditional approval from the various car manufacturers. He said that a minimum of 400 parking spots was needed, that he had attempted to obtain a five-year lease for an adjacent parking area from Commonwealth Edison and that the project was not viable without that lease.

The proposed plan was to be presented to the Plan Commission at its January 26, 1988, meeting, but there was a problem with the notice to the village residents. He testified that he attended the village meeting on February 23, 1988, and that the meeting had a "volatile atmosphere" and was "very, very hostile to say the least," requiring police intervention.

According to Grossinger, the public's reaction at the second Plan Commission meeting was also hostile. After hearing from the residents, the commission, with his prior acquiescence, recommended that no body or paint shop or fuel pump was to be operated on the premises; commercial carriers would not be used to pick up or deliver cars

to the site; right turns be prohibited from Touhy onto Kilbourn; and that the mall have only one entrance and one exit.

He then testified that without his prior acquiescence, the Plan Commission also amended the plan to allow only four advertising signs and to eliminate an exit at the back of the building. The commission's recommendation was contingent upon obtaining the parking lease from Commonwealth Edison. Grossinger stated that given all of these restrictions, he determined that the project was no longer viable and instructed that the contract be terminated. He denied that he prohibited his experts from assisting defendant in obtaining the rezoning. He asserted that he spent over $77,000 in the attempt to gain rezoning.

On cross-examination, Grossinger admitted that he had reached an agreement with Commonwealth Edison regarding the requisite parking area. Grossinger conceded that he knew the Plan Commission's recommendation was truly advisory. He also stated that he was told that it would normally take a couple of Plan Commission sessions and that then the Village Board would review the matter. He also conceded that he did nothing affirmatively after March 1, 1988, to assist defendant in satisfying the zoning conditions.

Plaintiff next called Lawrence Basil, Grossinger's architect, who testified that he prepared preliminary plans and specifications and presented plaintiff's proposal to the Plan Commission at the February 23, 1988, meeting. Basil stated that Grossinger expressed concern over the negative response of the community, which he felt would hurt his business and reputation. He said that Grossinger was also concerned with plaintiff's inability to obtain a rear exit from the building. He received word from Grossinger on March 2, 1988, to stop working on the project.

Plaintiff next called Michael Downing, who testified that he was an attorney who had specialized in zoning and land use law since 1977. Downing testified that he was retained by Grossinger in September 1987 to handle the land use and zoning aspects of the development at 4545 Touhy Ave. He stated that he was to assemble the development application team and present plaintiff's plan to the Plan Commission and then the Village Board. Downing filed the zoning application on December 21, 1987. He stated that he had no previous experience with the Village of Lincolnwood, but understood that the village would provide notice for those residents within 500 feet of the property. Downing stated that plaintiff was prepared to proceed at the January 26, 1988, meeting, but that the meeting was continued

until February 23, 1988, because no notice had been sent to the residents.

Downing received a letter from Zave Gussin, head of the Plan Commission, which stated that plaintiff would be expected to produce evidence of the Commonwealth Edison lease for the adjacent parking area. Gussin told him that the parking area was essential for the approval of the development. Gussin then stated that the 90-day cancellation provision in the Commonwealth Edison agreement was unsatisfactory as far as the village was concerned.

Downing corroborated that the public's reaction at the February 23, 1988, meeting was extremely hostile and that the March 1, 1988, meeting was less hostile although the residents remained opposed to the development. He related that after the meeting Grossinger told him that the restrictions placed on the development in the Plan Commission's recommendations were onerous and that the development could not succeed with these restrictions. Gussin informed him that he would not be able to present the matter to the Village Board on March 3, 1988, the next scheduled meeting, because there was not enough time to prepare a report. Downing testified that Grossinger informed him on March 14, 1988, that he had elected to terminate the contract. He received a letter from defendant's counsel on the same date asking him to attend the March 17, 1988, meeting. Upon asking Grossinger whether he should attend the meeting, Grossinger responded that he was not authorizing him to do so.

On cross-examination, Downing acknowledged that the Village Board was not bound by the recommendations of the Plan Commission. Downing testified that he had spoken to the mayor of Lincolnwood about adopting the ordinance on its first reading, but admitted that he never sent a letter to the mayor requesting this. He forwarded plaintiff's proposed lease with Commonwealth Edison to the village on February 15, 1988. Downing conceded that with respect to that lease, all the conditions required by the Plan Commission had been satisfied.

Downing told Grossinger that he thought that the Plan Commission's recommendations would be adopted by the Village Board at its next meeting, but that Grossinger had told him to sit tight because the restrictions were too onerous. Following his discussion with Grossinger, Downing called all the members of plaintiff's presentation team and told them that it was not necessary to appear at the March 17, 1988, board meeting. He also hand delivered a letter to the mayor of Lincolnwood informing him that Grossinger would not appear at that meeting. Plaintiff then rested.

Defendant called Zave Gussin, the chairman of the Plan Commission. Gussin testified that he prepared the commission report and issued it on March 14, 1988. Gussin stated that the 90-day cancellation provision in the Commonwealth Edison lease was acceptable to the village.

Defendant next called Morton Steinberg, who testified that he represented Grossinger in connection with the contract. He said that at the end of October 1987, he first noticed that Grossinger's proposed lease with Commonwealth Edison contained a 90-day termination provision. He then compared it to the cancellation provision in the Commonwealth Edison lease with defendant and found them to be similar. Defendant rested.

In its rebuttal case, plaintiff called Steinberg, who testified that the March 15, 1988, closing date was set by defendant's counsel. He stated that he asked for extensions numerous times, including a request to extend the closing until the end of March which was refused. On cross-examination, Steinberg testified that he knew when he agreed to the extension on February 29, 1988, that the Plan Commission would meet on March 1, 1988, and that the next Village Board meeting would probably be on March 17, 1988.

TRIAL COURT FINDINGS

On June 8, 1990, the trial court issued an opinion in defendant's favor. First, the court found that the liquidated damages provision was enforceable, stating that the earnest money amounted to only about 2% of the purchase price and that defendant had incurred substantial carrying costs pending the outcome of the zoning application.

The court further found that under the contract, the sale was subject to two contingencies: (1) obtaining rezoning of the property to accommodate plaintiff's plan; and (2) that plaintiff succeed in leasing adjacent parking spaces from Commonwealth Edison on substantially the same terms as Commonwealth Edison's lease with defendant. With respect to the Commonwealth Edison lease contingency, the court determined that although plaintiff's rental under its lease was somewhat greater than the rental under Commonwealth Edison's existing lease with defendant, the terms and provisions were otherwise substantially similar and satisfied that contingency provision under the contract.

In examining the rezoning contingency, the court found that the time for the purchaser's performance was eventually extended until March 4, 1988, and that the date of closing was extended until March 15, 1988. The court stated that the intent of the parties was to obtain

all the necessary permits and approvals by March 4 and to close on March 15. The trial court then looked at plaintiff's letter of February 24, 1988, in which plaintiff communicated its intention to pursue every means to persuade the Village Board to act at the March 17, 1988, meeting. The court found that this letter reasonably led defendant to believe that plaintiff was requesting an extension from March 4, 1988, to March 17, 1988, and that the effect of this letter was in fact to extend the deadline until the Village Board meeting of March 17, 1988, at the earliest.

The trial court went on to find that plaintiff's attempted termination of the contract was ineffective for two reasons:

"1. Plaintiff did not diligently pursue the satisfaction of the zoning requirements by applying to the final zoning authority for approval or disapproval; and

2. Plaintiff did not afford Defendants the opportunity to present the rezoning petition to the Village Board and attempt to convince the Board to approve the petition as originally presented."

In addition to this determination, the trial court noted that even prior to March 17, 1988, plaintiff's conduct manifested "a rather casual attitude towards rezoning," notwithstanding its preliminary expenses of more than $77,000. In this respect, the court commented that plaintiff first requested a comprehensive appraisal of the property on February 25, 1988, almost five months after the signing of the contract of sale. The trial court speculated that plaintiff's lack of vigor could be attributed to its disappointment with the Commonwealth Edison lease and with the indication that its contemplated autoplex facility would provoke the animosity and ill will of its prospective neighbors.

On June 26, 1990, defendant filed a petition seeking attorney fees pursuant to the fee provision in the contract. On October 3, 1990, the trial court entered an order awarding attorney fees to defendant subject to future compilation. On April 22, 1991, after an evidentiary hearing, the trial court awarded defendant $49,161.99 in attorney fees.

Plaintiff filed a notice of appeal from the trial court's order of June 8, 1990, which awarded defendant the earnest money, and from the orders of October 3, 1990, and April 22, 1991, awarding defendant attorney fees. Defendant subsequently filed a cross-appeal from the part of the April 22, 1991, judgment which awarded it only $49,161.99 in attorney fees, arguing that the trial court's award was inadequate.

OPINION

On appeal, plaintiff attacks the trial court's initial determination that the time for performance under the contract had been extended by the February 24, 1988, letter until March 17, 1988. Plaintiff argues that if the finding that the contract was extended until March 17, 1988, is erroneous, the trial court's subsequent conclusion that plaintiff did not act diligently in failing to present its plan to the Village Board on March 17, 1988, or cooperate with defendant's attempt to do so, must also fail as plaintiff would not be required to act after the expiration of the contract on March 15, 1988.

Whether a breach of contract occurred is a question of fact. (*Leazzo v. Dunham* (1981), 95 Ill. App. 3d 847, 420 N.E.2d 851.) A reviewing court will not disturb the trier of fact's determination unless the finding is against the manifest weight of the evidence. (*Menicocci v. Archer National Bank* (1978), 67 Ill. App. 3d 388, 385 N.E.2d 63; *Executive Centers of America, Inc. v. Bannon* (1978), 62 Ill. App. 3d 738, 379 N.E.2d 364.) Whether the terms of a written contract are modified by acts or conduct is a matter for the trier of fact and its determination will not be disturbed unless contrary to the manifest weight of the evidence. (*Stonecipher v. Pillatsch* (1975), 30 Ill. App. 3d 140, 332 N.E.2d 151.) A judgment is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent. *Valasquez v. Yellow Cab Co.* (1975), 32 Ill. App. 3d 934, 337 N.E.2d 365.

Here, plaintiff contends, however, that the construction of the letters between the parties is capable of *de novo* review and is not subject to a manifest weight of the evidence standard of review. There is some support for this position since the determination of their content does not depend on demeanor or credibility of witnesses, but on the construction of the written word. (*Schlobohm v. Police Board* (1984), 122 Ill. App. 3d 541, 544, 461 N.E.2d 601 (when evidence is documentary in nature, "a reviewing court is not bound by the circuit court's findings and may reach an independent decision on the facts").) However, we need not resolve that issue here since the trial court's determination that the letter of February 24, 1988, extended plaintiff's duties under the contract until at least March 17, 1988, is without sufficient support under either standard of review.

■ The trial court's finding that the letter of February 24, 1988, "reasonably led sellers to believe that purchasers requested an extension of the March 4, 1988, date to March, 17, 1988," is of no consequence. The record is clear that whatever expectations may have been

engendered by plaintiff's February 24, 1988, letter concerning any extension of the contract period, it was never accepted by defendant and was, in fact, rejected by defendant and repudiated by plaintiff.

The record is clear that defendant never responded to plaintiff's letter of February 24, 1988, which contained its extended offer to cooperate until March 17, 1988. Plaintiff's letter of February 24, 1988, was superseded by its subsequent letter of February 29, 1988, in which it sought to terminate the contract. Thus, the unilateral offer contained in plaintiff's February 24, 1988, letter was revoked in its subsequent letter of February 29, 1988, seeking to terminate the contract. (Restatement (Second) of Contracts §42, at 113 (1981) ("An offeree's power of acceptance is terminated when the offeree receives from the offeror a manifestation of an intention not to enter into the proposed contract"); see also *Rothenbuecher v. Tockstein* (1980), 88 Ill. App. 3d 968, 970, 411 N.E.2d 92 ("it is elementary that an offeree's power to accept is terminated by *** revocation of the offer"); *International Administrators, Inc. v. Life Insurance Co.* (N.D. Ill. 1983), 564 F. Supp. 1247 (making and acceptance of a latter offer implicitly revoked earlier offer contained in letter during contract negotiations), *aff'd* (7th Cir. 1985), 753 F.2d 1373.) Moreover, even in the absence of any revocation, defendant's letter of February 29, 1988, following plaintiff's termination notification of the same date, explicitly rejected plaintiff's offer to extend the contract to March 17, 1988, by limiting the extended dates of the contract to March 4, 1988, to satisfy the zoning conditions and to March 15, 1988, as the closing date. See *Brooks v. Village of Wilmette* (1979), 72 Ill. App. 3d 753, 391 N.E.2d 133 (contract cannot be unilaterally modified without consent of the other party); see also *Leazzo*, 95 Ill. App. 3d at 851-52 (sellers' delay in closing and delivering possession of subject real estate could not be construed as an agreement by the buyers to generally extend the April 1, 1979, closing date when throughout the negotiations buyers maintained that closing would be extended only until April 12, 1979).

Defendant contends that the trial court's decision that plaintiff breached the contract can also be upheld because the court made a finding that plaintiff failed to exercise diligence prior to March 15, 1988. However, reading the trial court's opinion in its entirety, it is clear that the trial court based its determination that plaintiff did not comply with the diligence requirement in seeking to rezone solely on plaintiff's failure to present its plan to the March 17, 1988, meeting or cooperate with defendant to do the same. The trial court addresses plaintiff's conduct prior to March 15, 1988, in a separate section of its memorandum opinion. In that section, the court explicitly refrained

from making any finding that plaintiff's pre-March 15, 1988, conduct resulted in a breach of the contractual conditions. While the trial court characterized plaintiff's conduct prior to March 15, 1988, as reflecting "a rather casual attitude towards rezoning," it notably refrained from making a determination that this conduct in and of itself constituted a breach and was sufficient to vitiate plaintiff's effort to recover its earnest money. Instead, the trial court chose to premise its finding in favor of defendant upon plaintiff's conduct with respect to the March 17, 1988, hearing with which finding we disagree.

Even if we agreed with the trial court's finding that plaintiff was in breach of its agreement, we would reverse the trial court's ruling for defendant on the independent ground that the liquidated damages provision of the contract is unenforceable.

Section 356(1) of the Restatement (Second) of Contracts provides:

"(1) Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty." Restatement (Second) of Contracts §356 (1981).

The determination of whether a contractual provision for damages is a valid liquidated damages provision or a penalty clause is a question of law. (*Hickox v. Bell* (1990), 195 Ill. App. 3d 976, 552 N.E.2d 1133.) There is no fixed rule applicable to all liquidated damage agreements, and each one must be evaluated by its own facts and circumstances. (*Likens v. Inland Real Estate Corp.* (1989), 183 Ill. App. 3d 461, 539 N.E.2d 182.) However, in interpreting provisions which affix the amount of damages in the event of a breach, courts "lean toward a construction which excludes the idea of liquidated damages and permits the parties to recover only damages actually sustained." *Arco Bag Co. v. Facings, Inc.* (1958), 18 Ill. App. 2d 110, 116, 151 N.E.2d 438; see also *Donow v. Board of Trustees of Southern Illinois University* (1974), 21 Ill. App. 3d 139, 314 N.E.2d 704.

In Illinois, courts will generally find a liquidated damages provision to be valid and enforceable in a real estate contract, when: (1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained; and (3) actual damages would be uncertain in amount and difficult to prove. (*Curtin v. Ogborn* (1979), 75 Ill. App. 3d 549, 394 N.E.2d 598; *Hayden v. Keep-*

*per-Nagel, Inc.* (1978), 62 Ill. App. 3d 828, 379 N.E.2d 116.) The damages must be a specified amount for a specific breach, not a penalty to punish for nonperformance or as a means to secure performance. *Builder's Concrete Co. v. Fred Faubel & Sons, Inc.* (1978), 58 Ill. App. 3d 100, 373 N.E.2d 863.

Plaintiff's primary challenge to the liquidated damages provision's enforceability is that, under these circumstances, the provision's optional nature constitutes a penalty. Plaintiff would contend that by reserving the option to seek compensatory damages, defendant intends for the liquidated damages option to operate only where it exceeds actual damages. In addition, plaintiff contends that this provision's optional nature prevents enforcement as it evidences that there was no effort to really fix a "specific sum of damages at the time of contracting." In opposition, defendant points out that the parties are commercially sophisticated and were represented by counsel in the drafting of the agreement and that the liquidated damages represented a relatively small percentage of the total purchase price.

█ We agree with plaintiff that this provision is unenforceable. As previously noted, the first consideration in determining whether a liquidated damages provision is enforceable is whether the parties intended to agree in advance to the settlement of damages that might arise from the breach. (*Curtin,* 75 Ill. App. 3d at 554.) On its face, the optional nature of the liquidated damages clause shows that the parties never intended to establish a specific sum to constitute damages in the event of a breach.

There is an apparent dearth of Illinois authority which discusses the enforceability of an optional liquidated damages provision. However, in the case of *Morris v. Flores* (1988), 174 Ill. App. 3d 504, 528 N.E.2d 1013, our second district upheld a liquidated damages provision where the contract allowed other remedies only after making a specific finding that the other remedies plaintiff had under the agreement were nonmonetary, stating:

> "While the contract does provide that the seller may retain the liquidated damages without prejudice to his 'other' remedies, the 'other' remedies refers to rights of a kind and character other than money damages. [Citation.] It would be inconsistent to provide in the contract for liquidated damages and also allow a party to pursue other remedies for money damages. * * *
>
> * * * As discussed above, the liquidated damages clause in this case did not prevent plaintiffs from seeking remedies other than money damages, such as injunctive relief. See *Bauer v.*

*Sawyer* (1956), 8 Ill. 2d 351, 358, 134 N.E.2d 329." *Morris,* 174 Ill. App. 3d at 507.

A recent decision by the Florida Supreme Court involved a clause similar to the one at issue here. By reasoning which we find persuasive, that court held unenforceable a provision in a real estate contract which allowed the seller of the property to retain earnest money as liquidated damages or, at the seller's option, to proceed in law or equity to enforce his rights under the contract. (*Lefemine v. Baron* (Fla. 1991), 573 So. 2d 326.) The court stated that "the existence of the option reflects that the parties did not have the mutual intention to stipulate to a fixed amount as their liquidated damages in the event of a breach" and indicates "an intent to penalize the defaulting buyer." (*Lefemine,* 573 So. 2d at 329.) The court explained:

"The buyer under a liquidated damages provision with such an option is always at risk for damages greater than the liquidated sum. On the other hand, if the actual damages are less than the liquidated sum, the buyer is nevertheless obligated by the liquidated damages clause because the seller will take the deposit under that clause. Because neither party intends the stipulated sum to be the agreed-upon measure of damages, the provision cannot be a valid liquidated damages clause." *Lefemine,* 573 So. 2d at 329-30.

In essence, such an optional liquidated damages provision fixes a minimum which must be paid from the buyer to the seller, "but leaves the door wide open to him to prove actual damage in addition to the so-called liquidated damage. This is no settlement at all and it permits the [seller] to have his cake and eat it too." (*Dalston Construction Corp. v. Wallace* (N.Y. Sup. Ct. 1960), 26 Misc. 2d 698, ____, 214 N.Y.S.2d 191, 193; see also *Stock Shop, Inc. v. Bozell & Jacobs, Inc.* (N.Y. Sup. Ct. 1984), 126 Misc. 2d 95, 481 N.Y.S.2d 269; *Jarro Building Industries Corp. v. Schwartz* (N.Y. Sup. Ct. 1967), 54 Misc. 2d 13, ____, 281 N.Y.S.2d 420, 426 (holding clause which provided for recovery of 25% of the total agreed contract price or actual damages was unenforceable as a penalty because it operated to "give appellant a minimum recovery regardless of actual damages and also affords him the option to disregard the liquidated damages specified if the actual damages exceeded the amount stipulated"); see generally J. Calamari & J. Perillo, The Law of Contracts §14—32, at 645 (3d ed. 1987) (commenting that provisions which fix damages in event of breach with an option to pursue actual damages "have been struck down as they do not involve a reasonable attempt definitively to estimate the loss").) We believe the reasoning of these cases to be controlling. Conse-

quently, the optional nature of the liquidated damages provision in this case which allows defendant to seek actual damages or alternatively to retain the earnest money as liquidated damages is unenforceable. In so holding, we note that if such an optional provision were enforceable, it would be invoked only as a penalty when the liquidated damages exceeded the actual damages. See *Jarro Building Industries*, 54 Misc. 2d at ____, 281 N.Y.S.2d at 426.

In sum, we conclude that the liquidated damages provision is unenforceable and that consequently defendant is only allowed to recover actual damages resulting from the breach. (*Hamming v. Murphy* (1980), 83 Ill. App. 3d 1130, 1137, 404 N.E.2d 1026.) Here, the evidence is clear that defendant has sold the property for $1,250,000 more than it would have received from plaintiff and has already amended its complaint to seek only liquidated damages, implicitly conceding that it incurred no actual damages from the breach. (*Cf. Feldstein v. Guinan* (1986), 148 Ill. App. 3d 610, 499 N.E.2d 535; *American National Bank & Trust Co. v. Erickson* (1983), 115 Ill. App. 3d 1026, 452 N.E.2d 3 (the purpose of damages is to place the non-breaching party in a position he would have been in had the contract been performed, not to provide him with a windfall recovery).) Thus, even if plaintiff were in breach of its agreement, it would nevertheless be entitled to the return of the earnest money in full since the liquidated damages provision is unenforceable and defendant did not suffer any actual damages.

The remainder of plaintiff's appeal and defendant's entire cross-appeal concerns the issue of attorney fees. The trial court awarded defendant $49,161.99 in attorney fees pursuant to the following contract provision, "In the event of any litigation arising hereunder, the unsuccessful party shall pay the reasonable attorney's fees of the prevailing party." Plaintiff contends that the award of fees was erroneous because defendant's original attorney was disqualified, necessitating duplicative effort by a second attorney. Defendant cross-appeals, alleging that the trial court's award was inadequate.

An unsuccessful party in a lawsuit is generally not responsible for the other party's attorney fees. (*Abreu v. Unica Industrial Sales, Inc.* (1991), 224 Ill. App. 3d 439, 586 N.E.2d 661; *Community Consolidated School District No. 54 v. Illinois State Board of Education* (1991), 216 Ill. App. 3d 90, 576 N.E.2d 250.) An exception to this rule is when a contract provides for the award of such fees, as is the case here. (*Abdul-Karim v. First Federal Savings & Loan Association* (1984), 101 Ill. 2d 400, 462 N.E.2d 488; *Myers v. Popp Enterprises, Inc.* (1991), 216 Ill. App. 3d 830, 576 N.E.2d 452.) In this instance, a

reasonable amount of fees is recoverable. 17A Am. Jur. 2d *Contracts* §502 (1991).

■ When interpreting contracts, contractual provisions for attorney fees must be strictly construed and the court must determine the intention of the parties with respect to the payment of fees. (*Helland v. Helland* (1991), 214 Ill. App. 3d 275, 573 N.E.2d 357.) Here, the key terms are "prevailing party" and "unsuccessful party." A party can be considered a "prevailing party" for the purposes of awarding fees when he is successful on any significant issue in the action and achieves some benefit in bringing suit (*Dial Manufacturing International, Inc. v. McGraw-Edison Co. International* (D. Ariz. 1987), 657 F. Supp. 248), receives a judgment in his favor (*American Federal Savings & Loan Association v. McCaffrey* (1986), 107 Wash. 2d 181, 728 P.2d 155) or by obtaining an affirmative recovery. (*Owen Jones & Sons, Inc. v. C.R. Lewis Co.* (Alaska 1972), 497 P.2d 312.) In light of our decision which returns the earnest money to plaintiff, plaintiff cannot be considered the "unsuccessful party" and defendant can no longer be considered the "prevailing party" under the contract. (See *Rinker v. County of Napa* (9th Cir. 1987), 831 F.2d 829 (party no longer considered "prevailing party" after reversal on appeal).) As such, the trial court's award of fees to defendant is vacated. Consistent with our decision, we remand this case to the trial court for a determination as to the amount of reasonable attorney fees, if any, to which plaintiff is entitled under the terms of the agreement.

Judgment reversed and remanded.

McNULTY, P.J., and COUSINS,* J., concur.

---

*Justice Murray heard oral arguments in this case, and following his recusal, Justice Cousins was substituted and he listened to the tapes of oral argument and read the briefs and the record.