

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-14-2003

# In Re: Montgomery

Precedential or Non-Precedential: Precedential

Docket 01-4286

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"In Re: Montgomery " (2003). *2003 Decisions.* Paper 590.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/590

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed April 14, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 01-4286
_____

IN RE:
MONTGOMERY WARD HOLDING CORP.,
A DELAWARE CORPORATION, ET AL.,
REORGANIZED DEBTORS

MONTGOMERY WARD & CO.,
INCORPORATED, ET AL.,
*Appellees*

v.

MERIDIAN LEASING CORPORATION,
*Appellant*

_____

Appeal from the United States District Court
for the District of Delaware
(D.C. No. 01-cv-00056)
District Judge: Honorable Joseph J. Farnan, Jr.

_____

Argued February 24, 2003

Before: BECKER, *Chief Judge*, SCIRICA, *Circuit Judge*,
and SHADUR,* *District Judge*

(Opinion filed: April 14, 2003)

_____

* Honorable Milton I. Shadur, United States District Court Judge for the
Northern District of Illinois, sitting by designation.

Daniel J. DeFranceschi
Michael J. Merchant
RICHARDS, LAYTON & FINGER
One Rodney Square
Wilmington, Delaware 19899

Kelley M. Griesmer (Argued)
JONES, DAY, REAVIS & POGUE
41 South High Street, Suite 1900
Columbus, Ohio 43215

*Attorneys for Appellees*

Howard L. Teplinsky (Argued)
Seidler & McErlean
One North Wacker Drive
UBS Tower, Suite 4125
Chicago, Illinois 60606

John D. Demmy
Stevens & Lee, P.C.
300 Delaware Avenue, 8th Floor,
 Suite 800
Wilmington, Delaware 19801

*Attorneys for Appellant*

---

## OPINION OF THE COURT

---

SHADUR, *District Judge:*

Meridian Leasing Corporation ("Meridian") appeals from an order of the United States District Court for the District of Delaware that reversed an order of its Bankruptcy Court by reducing the amount of the rejection damages claim that Meridian had filed against Montgomery Ward Holding Corp and Montgomery Ward & Co., Inc. (collectively "Montgomery Ward"). We affirm the District Court's decision that Meridian has sought to recover an amount that represents uncollectible punitive damages, but we remand for a determination of Meridian's damages at common law.

### Background

At issue on the current appeal are equipment leases running from Meridian to Lechmere, Inc. ("Lechmere"), a

wholly owned subsidiary of Montgomery Ward: an October 5, 1995 Master Lease Agreement ("Master Lease") that contemplated the leasing of computer equipment and two later Supplements that described and specified certain leased equipment, lease terms, rental payments, equipment locations, commencement dates and expiration dates. Montgomery Ward guaranteed Lechmere's obligations under the Master Lease and its Supplements.

On July 7, 1997 Montgomery Ward and other affiliated entities (including Lechmere) filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.[1] On November 17, 1997 Montgomery Ward and Meridian entered into an agreement for the rejection of the Supplements pursuant to Section 365, creating agreed-upon defaults on the lessee's part. About two weeks later the Bankruptcy Court granted Montgomery Ward's motion to reject the Supplements (each of which then had some ten months remaining before it would expire by its terms). Meridian then filed claims against Montgomery Ward that asserted damages stemming from the rejection of the Supplements.

Master Lease § 10 (A-77-78) defines Lechmere's bankruptcy as an Event of Default and sets out the remedy that Meridian then elected to pursue:

> (a) Each of the following shall constitute an Event of Default hereunder: . . . (iii) Lessee [Lechmere] becomes insolvent or admits in writing its inability to pay its debts as they mature, or applies for, consents to, or acquiesces in the appointment of a trustee or a receiver or similar officer for it or any of its property, or . . . a trustee or receiver or similar officer is appointed for Lessee . . . and is not discharged within 15 days, or any bankruptcy, reorganization, debt, dissolution or other proceeding under any bankruptcy or insolvency law . . . is instituted by or against Lessee. . . .

> (b) Upon the occurrence of an Event of Default . . . Lessor [Meridian] may, at its option, declare this Lease

---

1. Citations to the Code will take the form "Section —," using the 11 U.S.C. section numbering rather than the Code's internal numbering.

to be in default by notice to Lessee, and thereafter exercise one or more of the following remedies, as Lessor in its sole discretion lawfully elects:

*     *     *

(2) By notice terminate this Lease, whereupon all rights of Lessee in the Equipment will absolutely cease but Lessee will remain liable as hereinafter provided; and thereupon Lessee, if so requested, will at its expense promptly return the Equipment to Lessor at the place designated by Lessor. . . . Lessee will, without further demand, forthwith pay Lessor an amount equal to any unpaid Rent due and payable for all periods up to and including the Monthly Rent payment date following the date on which Lessor has declared this Lease to be in default, plus, as liquidated damages for loss of a bargain and not as a penalty, an amount equal to the Casualty Value of the Equipment then subject to this Lease, computed as of such Monthly Rent payment date.

In turn, "Casualty Value" was defined in Supplements 1 and 2.

Supplement 1 (A. 83-120) was an October 13, 1995 sale-leaseback transaction in which Meridian, having financed the cost of the equipment involved, leased it back to Lechmere for 36 months at a monthly rental of $144,720. (Red 9). Although Meridian had purchased the equipment for $6,070,923, the present value of Lechmere's total rental obligation at the commencement of the lease term was only $4,697,875.64. (A. 36). Supplement 1's Schedule B specified the "Casualty Value" of the leased equipment (the amount that Lechmere would have to pay in the event of a default during the lease term): (A. 118)

| Months Expired After Supplement Commencement Date | Casualty Value |
|---|---|
| 0 | $6,981,562 |
| 12 | 5,378,315 |

| | |
|---|---|
| 24 | 4,010,672 |
| 36[2] | 3,067,460 |

Supplement 2 was an April 29, 1996 transaction (with a May 1 commencement date) (A. 121-28) under which Meridian agreed to purchase equipment from an independent vendor and then lease it to Lechmere for 29 months at a monthly rental of $3,972 . (A. 37). Although Meridian paid $130,620 for the equipment, the present value of the rental stream was only $104,824.68. (A. 37). Supplement 2's Schedule B prescribed the "Casualty Value" of the leased equipment: (A. 127)

| Months Expired After Supplement Commencement Date | Casualty Value |
|---|---|
| 0 | $150,428 |
| 12 | 107,912 |
| 24 | 74,974 |
| 29[3] | 64,647 |

Meridian's Senior Vice President and Chief Financial Officer Michael Brannan ("Brannan") explained how the Casualty Value figures had been derived. According to his affidavit, (A. 38) each number was the sum of three components:

> 1. "the present value of the unpaid rent through the term of the lease,"

> 2. "the present value of the residual value of the equipment necessary for Meridian to recover its investment" and

> 3. "an amount allowing Meridian to realize a profit on the transaction."

Two other provisions of the Master Lease (and hence of each Supplement) bear mention. Master Lease § 12(d) stated that Lechmere was not obligated to renew its lease or to purchase any of the equipment. (A. 80). And Master

---

2. This 36-month figure was stated as the "Casualty Value" after the end of the lease term until the equipment itself was surrendered to Meridian.

3. See n.2.

Lease § 13(g) designated Illinois law as providing the substantive rules of decision. (A. 81).

*Standard of Review*

Because the bankruptcy court rather than the district court was the trier of fact in this case, "[w]e are in as good a position as the district court to review the findings of the bankruptcy court, so we review the bankruptcy court's findings by the standards the district court should employ, to determine whether the district court erred in its review" (*In re Fegeley*, 118 F.3d 979, 982 (3d Cir. 1997), quoting *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 102 (3d Cir. 1981)). While we review basic and inferred facts under the clearly erroneous standard, we exercise plenary review over legal issues (*id.*). Hence when we review ultimate facts—"a mixture of fact and legal precept"—we must differentiate between those two categories and "apply the appropriate standard to each component" (*id.*).

*Liquidated Damages v. Unenforceable Penalties*

Although the Master Lease characterizes the Casualty Value figures "as liquidated damages for loss of a bargain and not as a penalty," Illinois caselaw teaches that the tyranny of labels does not extend to the terms that are attached by parties to a contract. Instead the "determination of whether a contractual provision for damages is a valid liquidated damages provision or a penalty clause is a question of law" for the court (*Grossinger Motorcorp, Inc. v. Am. Nat'l Bank & Trust Co.*, 607 N.E. 2d 1337, 1345 (Ill. App. 1992). To that end both parties (Blue 18, Red 14) point to the Illinois version of the Uniform Commercial Code ("U.C.C.") § 2A-504 (enacted as 810 ILCS 5/2A-504):

> Liquidation of damages. (1) Damages payable by either party for default, or any other act or omission, including indemnity for loss or diminution of anticipated tax benefits or loss or damage to lessor's residual interest, may be liquidated in the lease agreement but only at an amount or by a formula that

> is reasonable in light of the then anticipated harm caused by the default or other act or omission.

And the Official Comment to that provision places flesh on its bones by setting out a standard that Meridian itself (Blue 18) confirms is an appropriate yardstick—particularly useful in this case—for testing the validity of a liquidated damages provision:

> A liquidated damages formula that is common in leasing practice provides that the sum of lease payments past due, accelerated future lease payments, and the lessor's estimated residual interest, less the net proceeds of disposition (whether by sale or re-lease) of the leased goods is the lessor's damages.

Analysis of the issues here is materially advanced by a preliminary exposition of some fundamentals of leasing. From the lessor's perspective, its lease rights in the absence of a lessee's contractual obligation to purchase the leased property at the end of the term[4] comprise (1) its entitlement to the rental flow and (2) its right to the return of the leased property at the end of the term (in the latter respect, see U.C.C. § 2A-103(q)). Thus any lessor that seeks an assured yield for its investment in the purchase of property to be leased out will peg the lease rentals at a level that, taking into account the expected value of the property to be returned at the end of the term, will generate that desired yield. To put the transaction in economic terms, the present value of the designated rental flow at the commencement of the lease term plus the present value of the expected remainder interest combine to provide an amount that represents the original investment in the property plus the desired profit from the lease transaction.

But a lessor is not of course compelled to structure the lease in such a self-amortizing fashion. In order perhaps to make its rental rate more attractive (because lower) than what may be offered by competitive leasing companies, the

---

4. Such an obligation would convert what is normally a lease into what is really a loan transaction, with the lessor providing property of a certain value in exchange for the repayment of that value plus a fixed yield.

lessor may choose to take the chance that the lease may be renewed at the end of the term at a rate such that any shortfall in the present value of the total rental flow produced by the original lower rental rate will be made up for by the greater value hoped to be realized after the initial lease term has run its course. But by definition that is a risk-taking decision, and one that is made even more risky by the possibility of a lessee's default before the full term has ended.

That latter event is precisely what has taken place here, and the question as to whether Meridian's option to structure its transaction in that manner involves the sought imposition of a penalty (rather than liquidated damages) must be examined in those terms. We turn then to that task.

Although Illinois courts have not yet taken the occasion to look to the earlier-quoted U.C.C. § 2A-504 to decide on the validity of a claimed liquidated damages provision in the lease context, their consistent approach to all damages issues is that the victim of a breach cannot be placed in a better position than it would have occupied if the contract had been performed (see, e.g., that accurate characterization of Illinois law in *Target Market Publ'g, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1145 (7th Cir. 1998)). And in the present context that conforms to the view adopted by the majority of courts that have construed the U.C.C. provision: No true liquidated damages provision can put the lessor in a position legally superior to the one that it would have occupied had the lease been fully performed (see, e.g., *Carter v. Tokai Fin. Servs. Inc.*, 500 S.E. 2d 638, 641 (Ga. App. 1998); *Coastal Leasing Corp. v. T-Bar S Corp.*, 496 S.E.2d 795, 797-99 (N.C. App. 1998); *In re Baldwin Rental Ctrs., Inc.*, 228 B.R. 504, 507-10 (Bankr. S.D. Ga. 1998)).

In those terms the requisite comparison must be to Meridian's entitlement if each lease had indeed been fully performed—a quantification most readily made in the analytical terms that we have set out earlier (for convenience we will look only at Supplement 1, for the analysis as to the far smaller Supplement 2 amount would be no different). We have been given the present value of the 36-month rental stream at Supplement 1's lease

commencement date as $4,697,875.64. (Blue 9). Although we are not furnished a precise number for the present value of the remainder interest at the outset (that is, the then-expected value of the equipment as it would be at the end of the lease, discounted to present value), we know that it must have been less than $1,373,047.93. (*id.*). And that is so because Meridian's actual cost of the equipment (without any profit component at all) was the sum of those two figures ($6,070,923.57). (*id.*). Indeed, from the fact that the ultimate sale of the recaptured equipment post-default (ten months before the leases' expiration date) came to just $486,960—less than 8% of the equipment's original cost—it would seem likely that the original present value of the remainder interest would have been more in that order of magnitude. And because, from Meridian's vigorous argument that it obviously had to collect much more than its original cost to realize its hoped-for profit, we know that the specified level of rent did not suffice to cover all except that remainder interest.

As against those numbers, the recovery of the specified Casualty Values would place Meridian in a far, far better position than its actual damages, which constitute the current equivalent of what the lease would have generated in the ordinary course—that is, the sum of the present value of future rentals to the end of the lease plus the present value of the remainder interest in the property at the end of the lease. There can be no question about any of that, for Meridian's own Senior Vice President and Chief Financial Officer Brannan confirmed that the Casualty Values included not only those two present values but also "an amount allowing Meridian to realize a profit on the transaction."[5]

---

5. Even Brannan's statement of the second present value component seems suspect. As quoted earlier, he referred to "the present value of the residual value of the equipment *necessary for Meridian to recover its investment*" (emphasis added). If that statement was intended to mean something more than the present value of the remainder simpliciter, it too would pose a problem as a reflection of Meridian's real damages. But that question need not be explored further, for the language just quoted in the text confirms that the amount sought by Meridian does not represent real damages, but rather an unrecoverable penalty.

Even though the reasonableness of any liquidated damages provision must be tested ex ante rather than ex post, an examination of the situation when the Master Lease and Supplements were actually rejected provides a graphic demonstration of the penalty represented by the Casualty Value provisions. At that time, apart from any past-due rents and the duty to return the leased equipment, Lechmere's sole financial obligation in terms of current dollars came to something less than $1,486,920.[6] But Meridian's demand for payment of the Casualty Values sought over $2 million in excess of that: $3,500,115 over and above the $486,966 realized on resale of the equipment. As Meridian characterizes that demand, the entire present value of the rental streams will go directly to Meridian's lender to cover outstanding debts from the purchase of the equipment, (Blue 23) while $1,398,843.14 is sought to cover Meridian's initial investment and the rest represents Meridian's attempt to "earn a gross 'profit' of $655,712 on the transaction, in line with its historical returns." (Blue 23).

That alone confirms that Meridian's effort is to realize what it hoped to gain—but had no assurance of obtaining—from the transaction, rather than its demonstrable damages measured by what Lechmere would have had the absolute right to do at the end of the lease term: to return rather than to buy, or continue to lease, the equipment. And that is the sure proof that the Casualty Value did not represent (in fact, did not even begin to approach) a far lesser liquidated damages figure.

As further confirmation of that conclusion, two other ways in which Illinois law has characterized the distinction between penalties and liquidated damages command the identical conclusion. We address them briefly.

First, *Stride v. 120 W. Madison Bldg. Corp.*, 477 N.E.2d 1318, 1321 (Ill. App. 1985), after reconfirming that the general damages principles of contract law extend to cases

---

6. That figure, awarded by the district court, is the total rent under the two Supplements for the remaining ten months of the lease term, without reduction to present value.

involving the breach of a lease, is exemplary of a number of Illinois cases that consistently teach:

> Where damages are difficult to ascertain, the parties may specify a particular sum as liquidated damages. However, if the clause fixing damages is merely to secure performance of the agreement, it will be treated as a penalty and only actual damages proved can be recovered. In doubtful cases, we are inclined to construe the stipulated sum as a penalty.

In those terms there is no question that the Casualty Values had as their purpose "to secure performance of the agreement." In comparison to the actual financial obligations called for by performance of the leases (remembering that Lechmere had no contractual obligation at the end of the term other than to return the equipment), the excessively large Casualty Value figures provided powerful in terrorem pressure for Lechmere to perform the leases rather than (for example) to terminate them voluntarily and pay the price for doing so in real damages. And the situation is of course no different when we look at a premature termination triggered by bankruptcy.

Still another perspective, and one that compels the identical result, is furnished by an examination of how the Casualty Values would themselves operate. To choose only an example or two, if Lechmere had breached Supplement 1 in the first month of the lease term, Meridian would have been entitled to so-called "liquidated damages" of $6,981,562—but if Lechmere had instead breached on the last day of the twelfth month (with Meridian having already received 12 monthly payments of $144,720, or $1,736,640), it would still receive the identical Casualty Value payment of $6,981,562. And if Lechmere had breached just one day later (on the first day of the thirteenth month), Lechmere's Casualty Value payment would have dropped to $5,378,315 —a difference of $1,603,247 for a mere 24 hours.

It is scarcely necessary to multiply the examples. What cannot be gainsaid is that such purported damages are "invariant to the gravity of the breach" (*Raffel v. Medallion Kitchens of Minn., Inc.*, 139 F.3d 1142, 1146 (7th Cir. 1998), decided under Illinois law)—again a hallmark of an

unenforceable penalty rather than a bona fide effort to quantify actual damages, as is permissible for a liquidated damages provision.

To recapitulate, Meridian deliberately chose to establish a lease pricing structure that substituted a lower (and thus more attractive to a lessee) monthly rental, with the potential for recoupment of its investment plus a profit through a hoped-for (but in no way assured) course of events after the lease ran its course, for a safer (but less attractive) higher rental that (when coupled with the expected value of the remainder interest) would provide for amortization of the investment and profit during the lease term. It cannot be heard to say that it made that choice in ignorance of the well-established Illinois doctrine that blocks purported liquidated damages provisions that the courts instead classify as penalties.

As *Checkers Eight Ltd. P'ship v. Hawkins*, 241 F.3d 558, 563 (7th Cir. 2001)(citations omitted) has explained, reflecting a difference of view as to the desirability of that doctrine but recognizing the proper role of the federal courts in mirroring state law in diversity cases:

> While we have noted similar criticisms in this circuit's opinions discussing Illinois penalty clause jurisprudence, Illinois continues to invalidate damages provisions in contracts that fail the test outlined above even if both parties are economically sophisticated. The plaintiffs' argument would prove too much if accepted, because then no damages clause between commercially experienced parties could be considered a penalty, which clearly contradicts actual Illinois law. Since, as aforementioned, we apply Illinois law in this case, we must reject the plaintiffs' argument.

In short, Meridian gambled on the future and lost—and because its hoped-for recoupment constituted an unenforceable penalty, it cannot shift the risk of that loss to Montgomery Ward.

Every analytical road thus leads to the same destination: What are stated in the Supplements as Casualty Values serve as an attempted penalty, not as legitimate liquidated damages. Meridian cannot thereby convert its hopes (or

even expectations) of a favorable lease renewal at the end of the lease term into a right that it did not possess as an entitlement by reason of its status as a lessor, to whom its lessee had the unfettered right simply to return the equipment at lease end.

All of that having been said, however, we cannot simply affirm the decision below, even though the district judge certainly reached the correct conclusion as to the unenforceability of the Casualty Values provisions. Although the parties have limited their argument to that question, the consequence of invalidity of an attempted penalty is not to penalize the lessor for such overreaching. Instead the principle is that stated in *Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1292 (7th Cir. 1985) after the court there had rejected a purported liquidated damages provision on penalty grounds under Illinois law:

> The fact that the damage formula is invalid does not deprive Lake River of a remedy. The parties did not contract explicitly with reference to the measure of damages if the agreed-on damage formula was invalidated, but all this means is that the victim of the breach is entitled to his common law damages. See, e.g., Restatement, Second, Contracts § 356, comment a (1981).

Accord, again applying Illinois law, *Checkers Eight*, 241 F.3d at 563.

To repeat the operative standard, at the time of breach Meridian was entitled to receive the sum of (1) the amount of any unpaid rent, (2) the present value at the time of breach of the monthly rentals for the then-remaining 10 months of the leases and (3) the then-present value of what would have been, when the lease terms began, the anticipated aggregate residual value of the leased equipment at the scheduled termination of the leases. It does not appear from the record that the first component was involved at all. As for the second, the sum of $1,486,920 awarded by the distsrict court represented the accelerated future rents without reduction (however modest) to their then present value. And the third component was never evaluated at all. Instead the district

court allowed to Meridian the full amount of the future rentals plus the $486,960 in net proceeds realized from the resale of the returned equipment.

We cannot be certain whether the district court's formulation overcompensated or undercompensated Meridian in terms of the proper measure of damages that we have outlined. If the former is the case, the present award will stand because Montgomery Ward has not taken a cross-appeal. But the second possibility—that the combined value of the $1,486,920 award plus the $486,960 in sale proceeds is less than the second and third elements identified in the preceding paragraph—poses a question that must be answered by the district court on remand.

### *Conclusion*

We AFFIRM the district court's determination that the Casualty Values specified in the Supplements constituted an unenforceable penalty, but we REMAND for a determination as to Meridian's actual damages in accordance with this opinion. We award costs to Montgomery Ward.

A True Copy:
          Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*