# United States Court of Appeals
## For the First Circuit

No. 16-1661

JOHN HANCOCK LIFE INSURANCE COMPANY ET AL.,

Plaintiffs, Appellants,

v.

ABBOTT LABORATORIES,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Lynch, Circuit Judges.

Joan A. Lukey, with whom John A. Nadas, Stuart M. Glass, Kevin J. Finnerty, and Choate, Hall & Stewart LLP were on brief, for appellants.
Jeffrey I. Weinberger, with whom Gregory D. Phillips, Elizabeth A. Laughton, and Munger, Tolles & Olson LLP were on brief, for appellee.

July 12, 2017

**SELYA**, **Circuit Judge**.  The development of new drugs is a costly, time-consuming, and highly speculative enterprise.  In an effort to hedge their bets, drug companies sometimes opt to share the risks and rewards of product development with outside investors.  This appeal introduces us to that high-stakes world.  The outcome turns primarily on a contract provision that the parties disparately view as a liquidated damages provision (and, thus, enforceable) or a penalty (and, thus, unenforceable).  A sum well in excess of $30,000,000 hangs in the balance.

Following a lengthy bench trial, the district court held the key provision inapposite and, in all events, unenforceable.  See John Hancock Life Ins. Co. v. Abbott Labs., Inc. (Hancock III), 183 F. Supp. 3d 277, 321, 323 (D. Mass. 2016).  After careful consideration of a plethoric record, we reverse the district court's central holding, affirm its judgment in other respects, and remand for further proceedings (including the entry of an amended final judgment) consistent with this opinion.

## I.  BACKGROUND

Plaintiff-appellant John Hancock Life Insurance Company,[1] disappointed by the meager fruits of its multimillion-dollar investment with defendant-appellee Abbott Laboratories

---

[1] Two affiliated corporations, John Hancock Variable Life Insurance Company and Manulife Insurance Company, also appear as plaintiffs and appellants.  We refer to all of the plaintiffs, collectively, as "Hancock."

(Abbott), seeks to increase its return through litigation.  In particular, Hancock aims to recover damages under its contract with Abbott or, in the alternative, to rescind that contract.  The parties' dispute is by now well-chronicled.  See John Hancock Life Ins. Co. v. Abbott Labs. (Hancock II), 478 F.3d 1, 2-6 (1st Cir. 2006); Hancock III, 183 F. Supp. 3d at 285-301; John Hancock Life Ins. Co. v. Abbott Labs. (Hancock I), No. 03-12501, 2005 WL 2323166, at *1-11 (D. Mass. Sept. 16, 2005).  We assume the reader's familiarity with these opinions and rehearse here only those facts needed to place this appeal into a workable perspective.

### A.  The Agreement.

In late 1999 or early 2000 — the exact date is of no consequence — Hancock (a financial services company) and Abbott (a pharmaceutical manufacturer) entered into negotiations regarding a potential investment in a menu of new drugs that Abbott was developing.  The parties chose nine specific Program Compounds that they hoped would mature into commercially successful drugs to treat various afflictions (such as cancer and urinary tract blockages).  During these negotiations, both Hancock and Abbott were represented by seasoned counsel, who exchanged approximately forty drafts of the proposed contract over a period of a year or more.

On March 13, 2001, the parties signed a research funding agreement (the Agreement). The Agreement is long and intricate, and we outline here only those provisions that are central to an understanding of the issues on appeal.

In the Agreement, Abbott pledged to develop the Program Compounds in accordance with Annual Research Plans that Abbott would submit for each Program Year over the course of a four-year Program Term. These Annual Research Plans were to contain "detailed statement[s] of the objectives, activities, timetable and budget for the Research Program for every Program Year remaining in the Program Term." Abbott prepared the first such Annual Research Plan for attachment as an exhibit.

The parties were to fund the development of the Program Compounds as specified in the Agreement and were meant to share in the profits. Hancock's funding obligations are precisely defined in section 3.1 of the Agreement: it would make four annual Program Payments, ranging from $50,000,000 to $58,000,000 each, over the course of the Program Term (a total of $214,000,000). Section 3.5, entitled "Hancock Funding Obligation," makes explicit that "Hancock's entire obligation [under the Agreement] shall be limited to providing the Program Payments set forth in [s]ection 3.1." In return for its investment, Hancock receives emoluments based on the progress and success of the Program Compounds. These emoluments include payments for the achievement of certain

milestones, such as the initiation of a clinical trial or U.S. Food and Drug Administration (FDA) approval. It also receives royalties from any out-licensing or sales of the Program Compounds.

The Agreement saddles Abbott with both annual and cumulative spending obligations. Annually, Abbott was responsible for meeting the Annual Minimum Spending Target; that is, it had to spend annually at least the sum of Hancock's contribution for that year, plus $50,000,000, plus any shortfall from the prior year's minimum spending target. Cumulatively, Abbott had to spend "at least the Aggregate Spending Target" — defined as $614,000,000 — "during the Program Term." In addition, Abbott is "solely responsible for funding all Program Related Costs in excess of the Program Payments from . . . Hancock."[2] These obligations comprise only Abbott's minimum spending commitment: that commitment is a floor, not a ceiling, and Abbott projected in its first Annual Research Plan that it would spend over one billion dollars (about five times Hancock's expected total contribution) through the end of 2004.

In what turned out to be a prescient precaution, the Agreement anticipates that Abbott might not fulfill its spending commitment. In this respect, section 3.2 of the Agreement provides

_____

[2] The district court assumed — and neither party disputes — that both Hancock's and Abbott's contributions are to be credited toward the Aggregate Spending Target. See Hancock III, 183 F. Supp. 3d at 316.

- 5 -

that if Abbott "fail[ed] to fund the Research Program in accordance with" its obligations, "Hancock's sole and exclusive remedies" are those remedies "set forth in [s]ections 3.3 and 3.4" of the Agreement. Section 3.3, entitled "Carryover Provisions," is divided into two subsections. If Abbott spends less than its Annual Minimum Spending Target, Hancock is allowed, under section 3.3(a), to defer its annual Program Payments until Abbott makes up that shortfall. Section 3.3(b) describes Hancock's remedies in the event that Abbott did not meet its cumulative spending obligations:

> If Abbott does not expend on Program Related Costs the full amount of the Aggregate Spending Target during the Program Term, Abbott will expend the difference between its expenditures for Program Related Costs during the Program Term and the Aggregate Spending Target (the "Aggregate Carryover Amount") on Program Related Costs during the subsequent year commencing immediately after the end of the Program Term. If Abbott does not spend the Aggregate Carryover Amount on Program Related Costs during such subsequent year, Abbott will pay to . . . Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days after the end of such subsequent year.

Section 3.4 permits Hancock to terminate future Program Payments under certain circumstances, including Abbott's failure to "reasonably demonstrate in its Annual Research Plan its intent and reasonable expectation to expend on Program Related Costs during

- 6 -

the Program Term an amount in excess of the Aggregate Spending Target."

To complete the picture, the Agreement contains a full-throated integration clause. Specifically, section 16.3 confirms that the "Agreement contains the entire understanding of the parties with respect to the subject matter hereof. All express or implied agreements and understandings, either oral or written, with respect to the subject matter hereof heretofore made are expressly merged in and made a part of this Agreement."

### B. The Fallout and the Litigation.

After the Agreement was signed, Hancock made its first two Program Payments, totaling $104,000,000. Even so, the relationship quickly began to fray. Abbott terminated the development of several compounds in the first two years and significantly reduced its spending on the development of other compounds. At the end of 2002, Abbott informed Hancock that Abbott's 2002 spending had been appreciably less than its Annual Research Plan had anticipated. More troubling still, Abbott's preliminary research plan for 2003 projected a sharp reduction in spending for that year compared to its previous estimate and made no mention at all of expected 2004 spending. In September of 2003, Abbott belatedly proffered its 2003 Annual Research Plan, which did include some projected spending for 2004. That submission,

though, further reduced total spending and admitted that Abbott would not reach the Aggregate Spending Target by the end of 2004.

After reviewing this document, Hancock responded that, in view of the insufficient spending that Abbott was prepared to undertake, it regarded its obligation to make future Program Payments as null and void. Abbott's rejoinder was of little solace to Hancock: it submitted a preliminary 2004 Annual Research Plan, indicating that Abbott would expend well below its annual minimum contribution in 2003 and would fail to reach the Aggregate Spending Target through the end of 2004. In both the final 2003 Annual Research Plan and the preliminary 2004 Annual Research Plan, however, Abbott predicted that it would reach the Aggregate Spending Target if 2005 spending were included.

Unsettled by this news, Hancock invoked diversity jurisdiction, see 28 U.S.C. § 1332(a), and filed suit in the United States District Court for the District of Massachusetts. That suit sought a declaration that Abbott's failure to meet its spending commitments terminated Hancock's obligation to make the third and fourth Program Payments. The district court granted summary judgment in favor of Hancock, holding that "Hancock's obligation to make the Program Payments for 2003 and 2004 terminated when Abbott failed to demonstrate its 'intention and reasonable expectation' to meet the . . . Aggregate Spending Target within the four-year Program Term in its [Annual Research Plan]

for 2003." Hancock I, 2005 WL 2323166, at *28 (quoting relevant language from the Agreement). We affirmed. See Hancock II, 478 F.3d at 2.

Notwithstanding that Hancock was judicially relieved of its obligation to make its last two Program Payments, it retained its rights under the Agreement to whatever profits might be derived from any of the Program Compounds. Hancock reports — and Abbott does not deny — that it has received slightly more than $14,000,000 in milestone payments, out-licensing revenues, and management fees. Comparing these receipts to its $104,000,000 investment, Hancock alleges that it incurred a net loss of almost $90,000,000 on the benighted venture.

Corporations seldom swallow losses of this magnitude complacently. And this case is no exception. In June of 2005 — while Hancock I was still unresolved — Hancock filed the instant action. It asserted that Abbott had breached the Agreement in five ways: (1) violating its representations and warranties through material misrepresentations and omissions regarding the development of the Program Compounds; (2) failing to provide Hancock with accurate spending projections; (3) refusing to pay Hancock one-third of the Aggregate Carryover Amount in accordance with section 3.3(b) of the Agreement; (4) failing to take appropriate steps to out-license the Program Compounds; and (5) obstructing Hancock's audit of Abbott's compliance with the

Agreement.  Hancock further asserted that Abbott fraudulently induced Hancock to enter into the Agreement and, separately, that under the indemnification provision of the Agreement, Abbott was liable for Hancock's losses attributable to Abbott's defaults.

In October of 2006 — roughly a month after this court's decision in Hancock II — Hancock sought leave to amend its complaint in this case to include a prayer for rescission.  Hancock included the rescission claim in its first amended supplemental complaint (filed in December of 2006).

The district court held a ten-day bench trial, which ended in 2008.  The court then solicited post-trial briefing and took the case under advisement.  It was not until April of 2016, though, that the court ruled.  In its opinion, the court made extensive findings of fact and conclusions of law.  See Fed. R. Civ. P. 52(a).  We summarize here only those findings and conclusions that are helpful to an understanding of the issues on appeal.

To begin, the court found that Abbott violated its representations and warranties in three ways:

- Without notifying Hancock, Abbott paused one compound's development two days before the Agreement was signed, only to lift the hold on the day the Agreement was signed.  Abbott canceled the compound three months later.  The court found that Abbott's failure to inform Hancock of the hold on the

- 10 -

compound's development was a material omission. See Hancock III, 183 F. Supp. 3d at 294, 306.

- Abbott represented that it intended to spend over $35,000,000 in 2001 on developing a compound intended to treat chronic pain. Yet Abbott knew before signing the Agreement that it actually intended to spend less than half that amount in 2001. The court found that "this misrepresentation . . . was material." Id. at 308-09.

- Abbott made a further material misrepresentation as to an anti-infection compound. See id. at 310. Abbott represented that it expected once-a-day dosing would be possible for the four conditions that the drug was designed to treat. Yet, the court found that, at the time the Agreement was signed, Abbott did not have enough information to know that once-a-day dosing would be possible for the two more severe conditions. Since Abbott knew that once-a-day dosing was important, this misrepresentation was material. See id.

Although these findings are emblematic of the rocky road down which the parties' relationship traveled, they proved to be hollow victories for Hancock. The district court ruled that Hancock did not sufficiently prove damages attributable to Abbott's misrepresentations and omissions because Hancock's methods for calculating damages were "speculative and unconvincing." Id. at 313.

The district court also found that Abbott breached the Agreement by providing Hancock with spending projections that assumed that every Program Compound would remain velivolant all the way to FDA approval.  Those projections, the court found, were submitted in lieu of more realistic projections of expected spending, which would have been adjusted for the risk that some compounds might be terminated.  See id. at 315.  Once again, Hancock could not recover for Abbott's breach because it did not adequately prove damages.  See id. at 316.

Moving to an issue that has become central to this appeal, the district court concluded that Abbott had not reached the Aggregate Spending Target.  The court determined that, including Hancock's contributions, Abbott fell $99,100,000 short of the target.  See id. at 292.  Hancock argued that section 3.3(b) entitled it to one-third of this amount, that is, an award of approximately $33,000,000.  The district court disagreed.  While it rejected Abbott's arguments that Hancock was judicially estopped from asserting its claim under section 3.3(b) and that the Agreement capped Abbott's spending obligation at $400,000,000, see id. at 317, it nonetheless concluded that Hancock was not entitled to any damages under section 3.3(b), see id. at 321, 323.

To reach this conclusion, the court identified an "apparent implied condition," which limited Abbott's liability under section 3.3(b) to pay Hancock one-third of the Aggregate

Carryover Amount to situations in which Hancock made all four Program Payments.  Id. at 318-19.  Striking Hancock a second blow, the court held in the alternative that even if section 3.3(b) applied, it constituted an unenforceable penalty.  See id. at 323.

The district court did allow recovery for one of Hancock's breach-of-contract claims.  It ruled that in the course of Hancock's audit of Abbott's compliance, Abbott "fail[ed] to provide information and material necessary for Hancock's vendor . . . successfully to conduct an audit."  Id. at 316.  The court ordered Abbott to pay Hancock the cost of the audit, which amounted to $198,731.  See id.

Turning to Hancock's rescission claim, the court struck that claim as "wholly irrelevant or impertinent."  Id. at 303. The court reasoned, inter alia, that rescission was inconsistent with the enforcement of the Agreement and that Hancock had chosen (in Hancock I) to enforce the Agreement.  See id. at 302-03.  Under the doctrine of election of remedies, it could not both affirm the contract and simultaneously seek its rescission.  See id.

Finally, the district court rebuffed Hancock's claim that Abbott was obligated under the Agreement to indemnify it for the losses that it incurred.  The court ruled that this indemnification provision only applied to claims by third parties. See id. at 326.

When the smoke cleared, the court below awarded Hancock $198,731 in damages for Abbott's frustration of the audit, together with $110,395.34 in prejudgment interest (a total judgment of $309,126.34). See id. This timely appeal ensued.

## II. ANALYSIS

Hancock's appeal challenges the district court's conclusion that its remedies under section 3.3(b) are contingent on its making all four Program Payments. Hancock also challenges the district court's alternative holding that those remedies constitute an unenforceable penalty. Finally, Hancock challenges the order striking its rescission claim.

We take a layered approach to these challenges. We first consider Abbott's contention that recovery under section 3.3(b) should be barred on grounds rejected by the district court. We then address the grounds upon which the district court relied. Those grounds are attacked by Hancock, and we address the components of Hancock's asseverational array one by one. We end with a brief comment on prejudgment and postjudgment interest.

We approach these several issues mindful that the Agreement contains a choice-of-law provision specifying that Illinois law governs. In line with this provision and with the parties' acquiescence, we apply the substantive law of Illinois (except where otherwise specifically noted). See McCarthy v. Azure, 22 F.3d 351, 356 n.5 (1st Cir. 1994) (explaining that "a

- 14 -

reasonable choice-of-law provision in a contract generally should be respected").

As a general matter, issues of contract interpretation engender de novo review under Illinois law. See St. Paul Mercury Ins. v. Aargus Sec. Sys., Inc., 2 N.E.3d 458, 478 (Ill. App. Ct. 2013). A reviewing court's principal task in interpreting a contract is to divine the parties' intent, which is manifested most clearly by "the plain and ordinary meaning of the language of the contract." Id. When a fully integrated contract is unambiguous on its face, the court will determine its meaning from its language alone. See Air Safety, Inc. v. Teachers Realty Corp., 706 N.E.2d 882, 884 (Ill. 1999). The court below concluded that the Agreement was unambiguous in its pertinent aspects, see Hancock III, 183 F. Supp. 3d at 318, 320, and neither party contests this conclusion. We agree. Thus, the question reduces to what that language means.

According to Hancock, section 3.3(b) requires Abbott to pay as liquidated damages one-third of the Aggregate Carryover Amount, that is, one-third of the difference between the Aggregate Spending Target ($614,000,000) and the combined amount actually spent by the parties ($514,900,000). Abbott disagrees with this proposition for several reasons, which we examine below. All of these reasons posit that the remedies limned under section 3.3(b) are available only when Hancock has made all four Program Payments,

- 15 -

notwithstanding that Hancock's cessation of Program Payments was due to Abbott's breach.

### A. Abbott's Rejected Defenses.

Abbott advances four rationales in support of its conclusion, two of which were rejected by the district court. We start with those rejected arguments.

As an initial matter, we note that those arguments are properly before us. Although Abbott has not filed a cross-appeal, we have jurisdiction to consider a prevailing party's alternative arguments in defense of a judgment where, as here, the arguments were made below. See Neverson v. Farquharson, 366 F.3d 32, 39 (1st Cir. 2004). In this instance, then, Abbott is entitled to argue for affirmance of portions of the district court's judgment on any ground asserted in the district court. See Mass. Mut. Life Ins. Co. v. Ludwig, 426 U.S. 479, 481 (1976) (per curiam); United States v. Matthews, 643 F.3d 9, 12 (1st Cir. 2011). The fact that no cross-appeal has been filed does not lessen this entitlement. See Neverson, 366 F.3d at 39.

1. **Judicial Estoppel.** Abbott asserts that Hancock's interpretation of section 3.3(b) is foreclosed by principles of judicial estoppel. The district court brushed this assertion aside, see Hancock III, 183 F. Supp. 3d at 317, and so do we.

Abbott assumes that federal law applies to its judicial estoppel defense. Yet, "[a]s judicial estoppel appears neither

- 16 -

clearly procedural nor clearly substantive, there may be a legitimate question as to whether federal or state law . . . should supply the rule of decision." Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 32 (1st Cir. 2004). Here, however, Hancock has not challenged the application of federal law to this issue, and "a federal court sitting in diversity is free, if it chooses, to forgo independent analysis and accept the parties' agreement" as to which law applies. Id. (quoting Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991)). We proceed accordingly.[3]

Generally speaking, judicial estoppel "precludes a party from asserting a position in one legal proceeding which is contrary to a position [that] it has already asserted in another." Patriot Cinemas, Inc. v. Gen. Cinema Corp., 834 F.2d 208, 212 (1st Cir. 1987). The doctrine "should be employed when a litigant is 'playing fast and loose with the courts,' and when 'intentional self-contradiction is being used as a means of obtaining unfair advantage.'" Id. (quoting Scarano v. Cent. R. Co., 203 F.2d 510, 513 (3d Cir. 1953)).

---

[3] At any rate, federal law and Illinois law do not appear to differ materially with respect to the elements of judicial estoppel. Compare, e.g., Patriot Cinemas, Inc. v. Gen. Cinema Corp., 834 F.2d 208, 212 (1st Cir. 1987), with, e.g., Seymour v. Collins, 39 N.E.3d 961, 973 (Ill. 2015).

Abbott claims that, in Hancock I, Hancock argued that "the Aggregate Spending Target represents the 'combined total' of the parties' defined minimum and maximum contributions, i.e., $400 million from Abbott and approximately $200 million from Hancock, and that the very purpose of the Agreement was for them to share the financial burdens . . . in that ratio." In support, Abbott points to two statements made by Hancock in the course of Hancock I: that it (Hancock) was "to share the cost of certain research and development activities" and that the Aggregate Spending Target was "[t]he combined total of . . . Hancock's maximum funding contribution and Abbott's minimum funding contribution." These statements do not bear the weight that Abbott loads upon them: the statement that costs would be shared says nothing about the amount that each party would contribute, and the references to maximum and minimum contributions do not necessarily import specific dollar amounts. Indeed, the raison d'être for the Hancock I litigation was Hancock's desire to obtain a declaration that its maximum contribution should be limited to $104,000,000 (in which event, Abbott's minimum contribution — on Hancock's view of the case — would be $510,000,000).

The short of it is that we discern no friction between Hancock's position in Hancock I and its position in the case at hand. Consequently, we hold — as did the district court — that

Hancock is not judicially estopped from advancing its interpretation of section 3.3(b).

**2.** **Abbott's "Cap" Defense.** Abbott next contends that its spending obligations are capped. In its view, the plain language of the Agreement shows that Abbott is not, under any circumstances, "required to spend more than its minimum $400 million share." Noting that section 3.5 provides that "Abbott shall be solely responsible for funding all Program Related Costs in excess of the Program Payments from . . . Hancock" and that section 3.1 defines Hancock's Program Payments as four installment payments totaling $214,000,000 that "Hancock shall make," Abbott suggests that its payment responsibility is capped at the difference between the Aggregate Spending Target and the sum of Hancock's four Program Payments. The district court disagreed with this suggestion, see Hancock III, 183 F. Supp. 3d at 317, as do we.

Under Illinois law, "[a] contract must be construed as a whole, viewing each provision in light of the other provisions." Thompson v. Gordon, 948 N.E.2d 39, 47 (Ill. 2011). To countenance Abbott's reading, we would have to cover much of the Agreement in Magic Marker. For example, section 3.5 does not refer to either Hancock's $214,000,000 contribution or its four Program Payments; rather, it refers only to Hancock's Program Payments in general. And even though section 3.1 refers to four installments totaling

$214,000,000, section 3.4 delineates several conditions which, if not complied with, "shall terminate" any obligation on Hancock's part "to make any remaining Program Payments." Given the language of section 3.4, Program Payments, as used in section 3.5, must mean whatever quantum of Program Payments Hancock is obligated to make under the Agreement — an amount that may be less than $214,000,000. We agree with the district court that the natural reading of section 3.5 is that "Abbott should be the <u>only party responsible</u> for making payments in excess of Hancock's contribution, not that Abbott should be responsible for paying <u>only the excess</u> of the Program Payments." <u>Hancock III</u>, 183 F. Supp. 3d at 318. Considering that the obvious purpose of section 3.5, which is entitled "Hancock Funding Obligation," is to set a ceiling for Hancock's contributions, that paragraph would be a curious place for the parties to tuck away a hidden limit on Abbott's funding obligations.

We add, moreover, that Abbott's theory does not account for section 3.2, which is entitled "Abbott Funding Obligation." This provision describes Abbott's obligation, in part, as spending "at least the Aggregate Spending Target during the Program Term." In other words, Abbott's spending obligation is not expressed in a fixed $400,000,000 lump sum but, rather, is expressed in terms of Abbott's commitment to help reach the Aggregate Spending Target. By linking Abbott's funding obligation to the Aggregate Spending

Target, section 3.2 appears to address the precise scenario in which Hancock's obligation to make all four Program Payments has been relieved under section 3.4.

If the parties had wanted to restrict Abbott's minimum contribution to $400,000,000, they surely would have said so: such a term easily could have been inserted in the Agreement. In sections 3.1 and 3.5, the parties capped Hancock's contribution at a fixed amount, but they elected not to impose such a cap when describing Abbott's contribution in section 3.2. A court should be reluctant to infer terms that parties easily could have included in a contract when the parties themselves chose not to include such terms. See Klemp v. Hergott Grp., Inc., 641 N.E.2d 957, 962 (Ill. App. Ct. 1994). We hold, therefore, that the plain language of the Agreement does not impose a ceiling of $400,000,000 on Abbott's minimum contributions.

**B.  Effect of Hancock's Failure to Complete Program Payments.**

The district court held, and Abbott echoes on appeal, that Abbott's obligation to pay under section 3.3(b) was discharged when Hancock failed to make all four Program Payments. See Hancock III, 183 F. Supp. 3d at 319-20. The court reached this conclusion notwithstanding our earlier decision relieving Hancock of its obligation, in light of Abbott's breach, to make the third and fourth Program Payments. See id. at 321; see also Hancock II, 478 F.3d at 9.

- 21 -

The district court relied principally on a Restatement provision that "[a] party's failure to render or to offer performance may . . . affect the other party's duties . . . even though failure is justified by the non-occurrence of a condition." Restatement (Second) of Contracts § 239(1) (Am. Law Inst. 1981). In the district court's view, Hancock's refusal to make its last two Program Payments, even though excused by Abbott's breach, was a partial failure to render performance, which shielded Abbott's obligation to pay under section 3.3(b). See Hancock III, 183 F. Supp. 3d at 319.

This analysis is flawed. Hancock did not fail to render performance in any meaningful sense but, rather, made timely Program Payments until Abbott, by its non-performance, pulled the rug out from under the deal. In such circumstances, we do not think that Abbott's breach can fairly be considered the "non-occurrence of a condition" within the purview of Restatement (Second) of Contracts section 239(1).

If more were needed, section 239 is not the law of Illinois. Neither Abbott nor the district court has identified any reported Illinois case that so much as hints at the adoption in that jurisdiction of section 239.[4] "[A]s a federal court sitting

---

[4] The district court acknowledged that no Illinois authority supports its interpretation of section 239. See Hancock III, 183 F. Supp. 3d at 319. In an attempt to fill this gap, the court cited to an intermediate state court opinion from a state other

in diversity jurisdiction, we ought not 'stretch state precedents to reach new frontiers.'"  Rared Manchester NH, LLC v. Rite Aid of N.H., Inc., 693 F.3d 48, 54 (1st Cir. 2012) (quoting Porter v. Nutter, 913 F.2d 37, 41 (1st Cir. 1990)).  Put another way, "[c]oncerns both of prudence and of comity argue convincingly that a federal court sitting in diversity must hesitate to chart a new and different course in state law."  Id.  Here, we decline to stretch inhospitable facts and, in the bargain, import an entirely novel principle into the jurisprudence of Illinois law.

That ends this aspect of the matter.  For both of the reasons discussed above, it follows that the district court erred in holding that Hancock's excused failure to complete the making of its Program Payments foreclosed relief under section 3.3(b) of the Agreement.

### C.  The "Implied Condition" Theory.

The district court's decision as to the inapplicability of section 3.3(b) also rests on a second pillar:  the court's view that the pertinent portions of the Agreement contain an apparent implied condition.  The court wrote that "the Agreement was not intended for [s]ection 3.3(b) to apply in situations where Hancock

---

than Illinois.  See id. (citing Kaufman v. Byers, 823 N.E.2d 530, 537 (Ohio Ct. App. 2004)).  Abbott adds only an unpublished Fifth Circuit opinion and another intermediate state court decision, not from Illinois.  See Khan v. Trans Chem. Ltd., 178 F. App'x 419, 426 (5th Cir. 2006) (per curiam); Facto v. Pantagis, 915 A.2d 59, 63 (N.J. Super. Ct. App. Div. 2007).

contributed substantially less than 35% of the total funding." Hancock III, 183 F. Supp. 3d at 320. Thus, the court seems to have discerned an implied term to the effect that Abbott's "obligation under [s]ection 3.3(b) is contingent upon Hancock's contribution of the full $214 million under [s]ection 3.1." Id. at 318. On appeal, Abbott clasps this line of defense to its corporate bosom.

It is an elementary rule of contract interpretation that "[i]f the words in [a] contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." Thompson, 948 N.E.2d at 47; see Shields Pork Plus, Inc. v. Swiss Valley Ag Serv., 767 N.E.2d 945, 949 (Ill. App. Ct. 2002) ("[I]f the contract terms are unambiguous, the parties' intent must be ascertained exclusively from the express language of the contract . . . ."). Consonant with that rule, Illinois courts ordinarily "will not add terms to an agreement when the agreement is silent about those specific terms." Frederick v. Prof'l Truck Driver Training Sch., Inc., 765 N.E.2d 1143, 1151 (Ill. App. Ct. 2002). This rule applies with particular force "when the added language would clearly change the plain meaning of the agreement," id., and even more so when an agreement is "completely integrated," Policemen's Benev. Labor Comm. v. County of Kane, 973 N.E.2d 1024, 1032 (Ill. App. Ct. 2012).

To be sure, there are limited circumstances in which a court may, by inference, import terms into a contract. One such exception holds that when a contract cannot be administered without some term that is critical to an assessment of the parties' rights and duties, a court may fill the gap and supply a reasonable term. See Barnes v. Michalski, 925 N.E.2d 323, 336 (Ill. App. Ct. 2010). But that device is to be employed sparingly and with great circumspection: "[a]lthough a court can declare an implied covenant to exist, that is only where there is in the express contract . . . a satisfactory basis which makes it necessary to imply certain duties and obligations in order to effect the [parties'] purposes . . . ." Mid-W. Energy Consultants, Inc. v. Covenant Home, Inc., 815 N.E.2d 911, 916 (Ill. App. Ct. 2004). Another exception holds that a court may sometimes infer a contract term when the circumstances are so unforeseeable that the parties could not reasonably have been expected to include a term addressing the situation. See Dato v. Mascarello, 557 N.E.2d 181, 183-84 (Ill. App. Ct. 1989) (citing Restatement (Second) of Contracts § 204). This, too, is a narrow exception that applies only "when the parties to an agreement entirely fail to foresee the situation which later occurs and gives rise to the dispute." Id. at 183.

The inferred term proposed by the district court and embraced by Abbott does not fit into any of the isthmian exceptions

to the general rule. For one thing, inferring such a term is in no way essential to administering the Agreement. The formula adumbrated in section 3.3(b) is entirely workable as it stands, both when Hancock makes all four Program Payments and when it does not. Courts should not add a new contractual term simply to assist one party to a contract in obtaining a better bargain. See Klemp, 641 N.E.2d at 962.

For another thing, the scenario that developed here was readily foreseeable. As drafted, section 3.2 affords Hancock remedies under both sections 3.3 and 3.4 with respect to any underspending by Abbott. Section 3.4 permits Hancock to terminate its future Program Payments during the Program Term. It was surely foreseeable, from the outset, that if Hancock did not make all four Program Payments, Abbott might not reach the Aggregate Spending Target. In that event, one would assume that Hancock would exercise its section 3.3(b) rights — yet nothing in the Agreement diminishes Abbott's obligations under section 3.3(b) if and when Hancock invokes section 3.4. This court has no license to engraft a new contractual term to address a wholly foreseeable concatenation of events.

We add, moreover, that section 3.2 lays out Abbott's funding obligations in both annual and cumulative increments. Cumulatively, it requires that Abbott spend "at least the Aggregate Spending Target during the Program Term." If Abbott "fail[s] to

fund the Research Program in accordance with this [s]ection," then "Hancock's sole and exclusive remedies . . . are set forth in [s]ections 3.3 and 3.4." The fact that the Agreement lists the remedies conjunctively must mean that Hancock is not limited to one or the other in the event of a breach by Abbott. See Manor Healthcare Corp. v. Soiltest, Inc., 549 N.E.2d 719, 725 (Ill. App. Ct. 1989) ("The words 'and' and 'or' ordinarily are not commutual terms; they should not be considered interchangeable absent strong supporting reasons."). Nor does anything else in the Agreement suggest the contrary.

In all events, section 3.3(b) is pointed: "[i]f Abbott does not spend the Aggregate Carryover Amount" during the fifth year (that is, if Abbott does not reach the Aggregate Spending Target during the year following the four-year Program Term), "Abbott will pay to . . . Hancock one-third of the Aggregate Carryover Amount that remains unspent by Abbott, within thirty (30) days after the end of such subsequent year." Plainly, Abbott did not spend the Aggregate Carryover Amount within the specified time frame, and any term excusing Abbott from performance is conspicuously lacking.

Notwithstanding this clear language, the district court held (and Abbott argues on appeal) that section 3.3(b) was intended only to preserve a fixed funding ratio (65/35) in situations in which Hancock made all four Program Payments. See Hancock III,

183 F. Supp. 3d at 319-20.  The genesis for this holding is the notion that, if everything went smoothly, the funding ratio between Abbott and Hancock would have been approximately 65% to 35% because Abbott would have contributed $400,000,000 and Hancock would have contributed $214,000,000.  Seizing upon this ratio, the district court concluded that, under section 3.3(b), some rough approximation of it obtained "in almost every situation" in which Hancock made all four Program Payments and Abbott nevertheless failed to reach the Aggregate Spending Target.  Id. at 319.  With this hypothesis in mind, the court surmised that the sole purpose of section 3.3(b) was to guarantee the same funding ratio in situations in which Hancock makes all four Program Payments but Abbott underspends.  See id. at 320.

The district court's logic does not withstand scrutiny. Although section 3.3(b) may preserve some semblance of the 65/35 ratio when Hancock makes all four Program Payments, it does not follow that section 3.3(b) may be invoked only in such circumstances.  After all, the Agreement's text does not limit section 3.3(b) to situations in which Hancock has made all four Program Payments.  Equally as important, the 65/35 ratio is not mentioned anywhere in the text of section 3.3.  Here, things did not go smoothly; Abbott failed to pay its share of the freight; as a result, Hancock was excused from making its last two Program Payments; and the 65/35 ratio never materialized.  Indeed, the

*Hancock II* panel anticipated our holding and expressly rejected Abbott's claim that the Agreement "required Hancock to spend half as much as Abbott." 478 F.3d at 8 n.4.

That rejection was inevitable, given that the Agreement both anticipates and allows a spectrum of potential funding ratios depending on the circumstances. To offer one example (out of several possible examples), Abbott's first Annual Research Plan proposed spending roughly five times more than Hancock's expected $214,000,000 contribution. We conclude, therefore, that the existence of a 65/35 funding ratio under one set of facts cannot contradict the plain language of the Agreement.

At the expense of carting coal to Newcastle, we remark the obvious: a fixed funding ratio in a contract with over $600,000,000 at stake is not a mere bagatelle. It strains credulity to think that parties who wanted such an important term to apply across the board would fail to include that term (or anything like it) in their contract. This is especially true when one considers that we are dealing with a fully integrated contract between sophisticated parties represented by experienced lawyers, who labored through approximately forty drafts of a detailed document over the course of a year or more. See *Policemen's Benev.*, 973 N.E.2d at 1032 (refusing to add term to "completely integrated agreement"); *Mid-W. Energy*, 815 N.E.2d at 916

- 29 -

(declining to add term to "clear and unambiguous" contract between sophisticated commercial parties).

In this regard, we deem it significant that the parties obviously knew how to include a funding ratio in a contract. Section 3.4 of the Agreement provides for a specified funding ratio in particular circumstances (not applicable here). The inclusion of a fixed spending ratio in one section of a contract but not in another creates a compelling basis for inferring that the parties deliberately chose to omit any fixed spending ratio from the latter provision. See generally Thompson, 948 N.E.2d at 47 (holding that use of different terms in different sections of contract warrants presumption that sections have different meanings); cf. Hamilton v. Conley, 827 N.E.2d 949, 957 (Ill. App. Ct. 2005) ("[W]here one section of a statute contains a particular provision, omission of the same provision from a similar section is significant to show different legislative intent for the two sections." (quoting In re D.F., 802 N.E.2d 800, 816 (Ill. 2003) (Freeman, J., concurring))).

The district court's characterization of Hancock's interpretation as "unreasonable" and "perverse," Hancock III, 183 F. Supp. 3d at 320, is insupportable.[5] The court emphasized its

_____

[5] In point of fact, the district court's reading is less reasonable than a plain-language reading. Under the district court's construction, if Abbott shirks its funding obligations during the Program Term, Hancock faces a Hobson's choice: it must

fear that any other reading would give Hancock a "windfall."  Id.
(quoting Roboserve, Inc. v. Kato Kagaku Co., 78 F.3d 266, 278 (7th
Cir. 1996)).  But this fear is misplaced: though the existence of
an alleged windfall may have some role in determining whether
section 3.3(b) is enforceable as a liquidated damages provision,
see infra Part II(D), a court's subjective belief that contract
terms may produce a windfall does not, without more, empower it to
disregard the plain meaning of those contract terms.  Here, there
is no "more" — and in this case, as in virtually every case, it is
perilous for a court to attempt to determine the intentions of
contracting parties through its view of the fairest or most
commercially reasonable way in which to construct a transaction.
"[W]hat seems commercially unreasonable to a court [may] not [have]
seem[ed] so to the parties."  XCO Int'l Inc. v. Pac. Sci. Co., 369
F.3d 998, 1005 (7th Cir. 2004).  Confronted with an unambiguous
and fully integrated contract, negotiated at arms-length, a
court's duty is to give force to the agreement's plain language.

        To sum up, the condition that the district court imposed
on Abbott's performance under section 3.3(b) is not found in the
language of the Agreement, which was fully integrated by virtue of

---

either withhold its future Program Payments (thus forgoing its
right to the damages that flow from Abbott's underspending) or
continue to make its Program Payments (thus throwing good money
after bad).

section 16.3.[6]  We will not subvert the plain language of the Agreement by plucking out of thin air a term that the parties easily could have included but chose to forgo.  See St. Paul Mercury, 2 N.E.3d at 478.  Simply put, the Agreement does not make Abbott's obligation under section 3.3(b) contingent on Hancock's completion of all four Program Payments.

### D.  **Enforceability of Section 3.3(b) Remedies.**

As is true in many jurisdictions, Illinois contract law distinguishes between liquidated damages (generally enforceable) and penalties (generally unenforceable).  A liquidated damages clause is one that provides in advance that a breaching defendant will pay "a specific amount for a specific breach."  Jameson Realty Grp. v. Kostiner, 813 N.E.2d 1124, 1131 (Ill. App. Ct. 2004).  The purpose of such a clause "is to provide parties with a reasonable predetermined damages amount where actual damages may be difficult to ascertain."  Karimi v. 401 N. Wabash Venture, LLC, 952 N.E.2d 1278, 1290 (Ill. App. Ct. 2011).  At least in theory, such provisions minimize uncertainty and reduce litigation costs, easing the burden on both the parties and the judicial system.

---

[6] The district court did say that "other provisions in the contract explicitly state that Abbott is obligated to comply with [s]ection 3.3(b) only if Hancock contributes all four of the Program Payments."  Hancock III, 183 F. Supp. 3d at 318.  However, the court never identified any such provisions, and we have found none.

- 32 -

See Restatement (Second) of Contracts § 356 cmt. a. Penalties are a horse of a different hue. When the sum or formula that is agreed upon in advance is not reasonably correlated with future damages and instead acts either as a threat to secure performance or as a punishment for non-performance, the provision is an unenforceable penalty. See Inland Bank & Trust v. Knight, 927 N.E.2d 777, 782 (Ill. App. Ct. 2010).

Nomenclature is not dispositive. Whether a provision is held to be a liquidated damages provision or a penalty provision depends on the nature of the provision, not on how it is labeled. See Penske Truck Leasing Co. v. Chemetco, Inc., 725 N.E.2d 13, 19 (Ill. App. Ct. 2000).

In this instance, Abbott agreed to section 3.3(b) after protracted arm's-length negotiations in which both sides were represented by seasoned counsel. Abbott now asks us to relieve it of this bargained-for obligation on the ground that the obligation constitutes a penalty that the law of Illinois does not tolerate. As the party resisting enforcement of section 3.3(b), Abbott bears the burden of proving that the provision imposes an impermissible penalty rather than a permissible means of measuring liquidated damages. See XCO Int'l, 369 F.3d at 1003; Penske, 725 N.E.2d at 20. Because the validity and enforceability of a putative liquidated damages provision presents a question of law, see Fleet Bus. Credit, LLC v. Enterasys Networks, Inc., 816 N.E.2d 619, 633

(Ill. App. Ct. 2004), we review de novo the district court's determination that section 3.3(b) is an unenforceable penalty, see Kunelius v. Town of Stow, 588 F.3d 1, 13 (1st Cir. 2009).

There is no hard-and-fast rule for separating liquidated damages provisions from penalty provisions. Instead, each clause "must be evaluated by its own facts and circumstances." Grossinger Motorcorp, Inc. v. Am. Nat'l Bank & Trust Co., 607 N.E.2d 1337, 1345 (Ill. App. Ct. 1992); see Penske, 725 N.E.2d at 19.

The Illinois cases (including federal cases applying Illinois law) send mixed messages about the degree of suspicion with which putative liquidated damages provisions should be viewed. On the one hand, some case law suggests that close calls should be resolved in favor of declaring the disputed clause to be a penalty.[7] See, e.g., GK Dev., Inc. v. Iowa Malls Fin. Corp., 3 N.E.3d 804, 816 (Ill. App. Ct. 2013); Stride v. 120 W. Madison Bldg. Corp., 477 N.E.2d 1318, 1321 (Ill. App. Ct. 1985). On the other hand, the Illinois cases tend to give effect to the provision in the absence of fraud or unconscionable oppression. See, e.g., Zerjal v. Daech & Bauer Constr., Inc., 939 N.E.2d 1067, 1074 (Ill. App. Ct. 2010) ("In general, Illinois courts give effect to liquidated-damages provisions so long as the parties have

---

[7] This preference for penalties has at times been voiced by courts upholding liquidated damages provisions. See, e.g., JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co., 707 F.3d 853, 867 (7th Cir. 2013).

'expressed their agreement in clear and explicit terms and there is no evidence of fraud or unconscionable oppression, a legislative directive to the contrary, or a special social relationship between the parties of a semipublic nature.'" (quoting Hartford Fire Ins. Co. v. Architectural Mgmt., Inc., 550 N.E.2d 1110, 1114 (Ill. App. Ct. 1990))); Newcastle Props., Inc. v. Shalowitz, 582 N.E.2d 1165, 1170 (Ill. App. Ct. 1991) (similar). Here, however, we need not sort through this speckled landscape. When all is said and done, the conclusion that section 3.3(b) is an enforceable liquidated damages provision is inescapable.

A liquidated damages provision is enforceable as long as three conditions are satisfied:

> (1) the parties intended to agree in advance to the settlement of damages that might arise from a breach, (2) the amount provided as liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained, and (3) the actual damages would be uncertain in amount and difficult to prove.

Dallas v. Chi. Teachers Union, 945 N.E.2d 1201, 1204 (Ill. App. Ct. 2011) (citing Jameson, 813 N.E.2d at 1130). In our judgment, all three of these conditions are satisfied here.

The first and third conditions are plainly met. As to the first, it is clear beyond hope of contradiction that Hancock and Abbott intended to agree in advance to the settlement of the damages that might result from a particular kind of breach. A

reading of the Agreement as a whole leaves no doubt that the parties intended that section 3.3(b) would serve as the exclusive measure of damages in that event. The provision evinces the parties' joint effort to fix a determinable sum as damages at the time of contracting — and that is a hallmark of a valid liquidated damages clause. See Grossinger, 607 N.E.2d at 1346.

We recognize, of course, that section 3.3(b) was not described in the Agreement as either a liquidated damages provision or a penalty provision — and it surely would have been prudent (and easy) for the parties to have made such a designation. But even though language in the Agreement describing the nature of the provision would have been helpful (albeit not conclusive) in showing the parties' intent, the absence of any such description is a wash. See Berggren v. Hill, 928 N.E.2d 1225, 1231 (Ill. App. Ct. 2010) (considering provision in real estate contract allowing seller to keep earnest money in event of breach to be liquidated damages provision even though term "liquidated damages" not used).

We may infer the parties' intent from the language and structure of the Agreement, see Jameson, 813 N.E.2d at 1132-33, and it is evident here that the parties intended section 3.3(b) to operate as a liquidated damages provision. According to section 3.2, "Hancock's sole and exclusive remedies for Abbott's failure" to fulfill its funding obligations "are set forth in [s]ections 3.3 and 3.4." Section 3.3(b), in turn, allows Hancock to recover

damages for Abbott's underspending in accordance with a set formula. When parties agree to a formula to calculate a monetary remedy that must be paid in the event of a specific type of breach, the provision embodying that formula is normally intended to operate as a liquidated damages provision.[8] See N. Ill. Gas Co. v. Energy Coop., Inc., 461 N.E.2d 1049, 1055 (Ill. App. Ct. 1984). So it is here.

The third condition for a valid liquidated damages provision is also satisfied. That condition requires that, in the event of a breach, actual damages (viewed as of the time of contracting) would be difficult to calculate and, thus, uncertain. See Jameson, 813 N.E.2d at 1132. If it appeared to the parties at the time of contracting that actual damages would be readily calculable, a provision stipulating a materially different (higher) amount would be a penalty, not a liquidated damages provision. See Lake River Corp. v. Carborundum Co., 769 F.2d 1284, 1289-90 (7th Cir. 1985) (applying Illinois law); Stride, 477 N.E.2d at 1321.

---

[8] Abbott suggests that the "intent" element is lacking because "[t]here is no evidence that the parties intended [section 3.3(b)] to apply where Hancock has not made its full $214 million contribution." This argument merely reprises Abbott's previously rejected claim that section 3.3(b) does not apply unless Hancock makes all four Program Payments, see supra Part II(B)-(C), and we need not repastinate that well-plowed soil.

Here, it is nose-on-the-face plain that Hancock's damages for any failure on Abbott's part to reach the Aggregate Spending Target would have been surpassingly difficult to calculate at the time of contracting. The Program Compounds had to clear countless hurdles, including successful scientific development, positive clinical testing results, regulatory approvals, navigating the shoals of competitive forces, and the establishment of profitable marketing and distribution arrangements. Even if things went like clockwork, the culmination of that process would take years. Under these circumstances, the uncertainty associated with the successful development of the Program Compounds is manifest and heralds a similar degree of uncertainty about the financial returns that Hancock's investment was likely to yield.

This uncertainty becomes pervasive when one considers that the damages from Abbott's breach of its spending obligation are virtually impossible to quantify in advance because section 3.3(b) seeks to approximate not Hancock's future profits in their entirety but, rather, the amount by which those profits would be reduced if Abbott underspent. Even with the benefit of hindsight, the district court observed that the diminution in profits attributable to Abbott's underspending is "inherently difficult to quantify." Hancock III, 183 F. Supp. 3d at 321. Although the existence vel non of uncertainty must be determined with reference

to the time of contracting, the inscrutability of actual damages after the breach reinforces our conclusion that pervasive uncertainty was baked into the cake from the very beginning.[9]  Cf. Karimi, 952 N.E.2d at 1288 (considering post facto actual damages to show uncertainty at time of contracting).

Abbott's attempt to parry this thrust is unconvincing. It says that Hancock "[a]t various times . . . calculated its expected rates of return on the Agreement."  That is true as far as it goes, but it does not take Abbott very far.  The two estimates to which it points differ substantially not only from each other but also from the investment's actual performance.  Incorrect and fluctuating estimates of a party's anticipated returns are indications that actual damages were difficult to quantify and were therefore uncertain.[10]  See Jameson, 813 N.E.2d at 1133.

---

[9] The opacity of Hancock's actual damages distinguishes this case from Lake River, 769 F.2d at 1290, in which the Seventh Circuit found that a provision was "a penalty and not a liquidation of damages, because it is designed always to assure [the plaintiff] more than its actual damages."  The same cannot be said of section 3.3(b) because Hancock's actual damages are, as the district court found, "unknowable."  Hancock III, 183 F. Supp. 3d at 321.

[10] Abbott makes a separate argument that its underspending may not have caused "actual harm" and that "a monetary infusion would not have changed" the viability of the failed compounds.  Whatever merit this argument might have in determining the reasonableness of a liquidated damages formula, it has no relevance to the uncertainty inherent in predicting, at the time of contracting, the damages apt to flow from Abbott's underspending.

We conclude that the uncertainty of actual damages brings this case well within the heartland of those cases in which Illinois courts have found actual damages sufficiently uncertain to warrant the use of a liquidated damages provision. See, e.g., Karimi, 952 N.E.2d at 1288; Jameson, 813 N.E.2d at 1132; Penske, 725 N.E.2d at 20; Likens v. Inland Real Estate Corp., 539 N.E.2d 182, 185 (Ill. App. Ct. 1989). Accordingly, we hold that the third condition of the liquidated damages paradigm has been satisfied.

This leaves the question of whether section 3.3(b), viewed from the perspective of the time of contracting, forged a reasonable estimate of actual damages. In answering this question, we start by rehearsing how actual damages would be measured at common law for Abbott's breach. Under Illinois law, a non-breaching party is entitled to damages sufficient "to place [him] in a position that he . . . would have been in had the contract been performed, [but] not to provide [him] with a windfall recovery." GK Dev., 3 N.E.3d at 816 (quoting Jones v. Hryn Dev., Inc., 778 N.E.2d 245, 249 (Ill. App. Ct. 2002)). Such damages may include lost profits as long as the plaintiff proves three elements: the plaintiff first must establish "the loss with a reasonable degree of certainty," then establish that the "defendant's wrongful act resulted in the loss," and, finally, establish that "the profits were reasonably within the contemplation of [the] defendant at the time the contract was

entered into." InsureOne Indep. Ins. Agency, LLC v. Hallberg, 976 N.E.2d 1014, 1033-34 (Ill. App. Ct. 2012) (quoting Equity Ins. Mgrs. of Ill., LLC v. McNichols, 755 N.E.2d 75, 80 (Ill. App. Ct. 2001)).

Because the asserted breach in this case consists of Abbott's failure to reach the Aggregate Spending Target, Hancock is entitled to damages reflecting the profits that it would have garnered if Abbott had spent the required amount. Of course, even though Abbott has breached, Hancock is still entitled to its share of whatever profits the Program Compounds may earn. The possibility that revenues will be forthcoming from this source must be taken into account in gauging the reasonableness of the section 3.3(b) formula.

To be valid and enforceable, section 3.3(b) need not perfectly replicate actual loss. Instead, it must only bear some relation to the loss — here, the lost profits attributable to Abbott's underspending. See Dallas, 945 N.E.2d at 1205. The inquiry is prospective, not retrospective: we do not compare the amount derived by application of the liquidated damages formula to a post facto appraisal of the actual damages. Rather, we ask whether "the amount reasonably forecasts and bears some relation to the parties' potential loss as determined at the time of contracting." Karimi, 952 N.E.2d at 1288.

Measuring future damages inevitably entails a certain amount of guesswork, and we afford the parties more leeway as the difficulty of estimating damages increases. See XCO Int'l, 369 F.3d at 1001-02; see also United Order of Am. Bricklayers & Stone Masons Union No. 21 v. Thorleif Larsen & Son, Inc., 519 F.2d 331, 335 (7th Cir. 1975) (explaining that "the greater the difficulty of estimating the damages, the greater will have to be the latitude accorded to the determination of the reasonableness of the forecast"). This principle fits neatly with the purpose of liquidated damages provisions because "the case for a contractual specification of damages is stronger the more difficult it is to estimate damages." XCO Int'l, 369 F.3d at 1001.

The degree of uncertainty in this case is pronounced, and our inquiry into the enforceability of section 3.3(b) must take that high degree of uncertainty into account. The question is not whether section 3.3(b) anticipates Hancock's actual damages with precision, nor even whether its formula provided the best possible estimate with respect to this particular breach. Given the uncertainty of actual damages at the time of contracting, section 3.3(b) ought to be upheld unless its formula is apt to produce "an outlandish estimate of the damages that [the non-breaching party] might sustain as a result of" the breach. Id. at 1003.

A salient feature of section 3.3(b) is that it operates proportionally. Liquidated damages provisions that operate on a sliding scale, proportional to the magnitude of the breach, are favored because they indicate that the parties were attempting in good faith to estimate the damages likely to flow from a particular breach. See id. at 1004; Jameson, 813 N.E.2d at 1133 (upholding liquidated damages award that varied based on number of units). A single, invariant sum for all breaches too frequently will yield an unrealistic estimate of actual damages for any given breach. See, e.g., Energy Plus Consulting, LLC v. Ill. Fuel Co., 371 F.3d 907, 909-10 (7th Cir. 2004); Checkers Eight Ltd. P'ship v. Hawkins, 241 F.3d 558, 562 (7th Cir. 2001); GK Dev., 3 N.E.3d at 817.

Two simple and related propositions fortify our conclusion that section 3.3(b) reasonably forecasts and bears a sufficient relation to Hancock's potential loss (as envisioned at the time of contracting). First, it seems to us a commonsense proposition that, in this context, higher spending is likely to increase future profits. Second, it seems equally probable that the amount of lost profits will be higher when the spending shortfall is greater. One could reasonably have thought, at the time of contracting, that a larger infusion of cash by Abbott would make available additional resources for the development of the Program Compounds and, at the same time, would indicate Abbott's renewed commitment to the success of those compounds. Conversely,

one could reasonably have thought, at the time of contracting, that a reduced investment by Abbott would shrink the resources available for the development of the Program Compounds and, at the same time, would indicate a lessened commitment to the success of those compounds, thus dampening Hancock's prospects for profits. One could of course imagine circumstances under which additional spending might not lead to greater profits or under which a larger spending shortfall might not result in higher lost profits. One or both of the sophisticated parties to this transaction undoubtedly considered such possibilities. Yet we are not concerned with the universe of potential eventualities but, rather, with reasonable assumptions about the enterprise's general prospects as viewed from the time of contracting.

Section 3.3(b) builds upon these propositions. Under its formula, Hancock's damages increase proportionally to the magnitude of the disparity between actual spending and the Aggregate Spending Target. A formula that increases Hancock's damages proportionally to the Aggregate Carryover Amount — as this formula does — seems well-calculated to afford a reasonable estimate of Hancock's actual damages. We hold, therefore, that this final condition of the liquidated damages paradigm is met.

That ends this aspect of our inquiry. Inasmuch as all three of the requisite conditions for the enforcement of a liquidated damages provision are satisfied, section 3.3(b)

constitutes an enforceable liquidated damages provision. Abbott resists this determination, advancing a triumvirate of overlapping arguments. Whether viewed singly or in combination, these arguments fail to persuade.

To begin, it points out that the formula does not distinguish between shortfalls caused by Hancock's reduced contributions and shortfalls caused by Abbott's withholding of funds. Had Hancock made all four of its scheduled Program Payments, the Aggregate Spending Target would have been achieved. Since Hancock's reduced contributions "caused" the shortfall, Abbott's thesis runs, a formula that nonetheless awards Hancock damages must unreasonably estimate damages.

This thesis twists the language of the Agreement. Under the terms of the Agreement, it is Abbott's sole responsibility, set out in section 3.2, to fund "at least the Aggregate Spending Target during the Program Term." Abbott's thesis implies that its spending obligation is capped at $400,000,000 — but the Agreement says no such thing. Where, as here, Hancock is excused under section 3.4 from making some future payments, Abbott's minimum spending obligation climbs proportionally (to points above $400,000,000). Contrary to Abbott's self-serving assertion, there was no need for the Agreement — either as a matter of law or as a matter of logic — to "distinguish between underspending attributable to lower contributions by Hancock and underspending

caused by lower contributions by Abbott." They are in essence one and the same.

Abbott next complains that section 3.3(b), construed in the manner that Hancock envisions, gives Hancock a greater award the earlier the breach occurs (when Hancock has invested less). As Abbott sees it, section 3.3(b) generates a windfall for Hancock because Hancock is entitled to a larger award when the breach occurs earlier in the Program Term. But this is not a windfall; it is merely a feature of how the formula is designed to work. The damages decrease as the spending shortfall decreases because section 3.3(b) is meant to estimate the impact of underspending on future profits. This design makes commercial sense: as the spending shortfall shrinks, the adverse effect on total profits should be less. Thus, it is reasonable to anticipate that a breach by Abbott early in the Program Term (when much less has been spent on the development of the Program Compounds) will have a more deleterious effect on future profits. If the Program Term has run its course (or nearly so) and the Aggregate Spending Target has almost been reached, the smaller shortfall presumably would have a less severe impact on the program's long-term profitability.[11]

---

[11] Abbott's windfall concern might be justified if Hancock could manipulate the Agreement and choose to forgo future Program Payments in order to reap an undeserved harvest under section 3.3(b). No such danger looms, though, because Abbott controls whether Hancock's duty to make all four Program Payments persists. This case illustrates the point: Hancock's obligation to make its

An Illinois court previously has rejected an argument analogous to Abbott's argument. In Jameson, the plaintiff (a real estate agent) contracted with the defendant-developer for the exclusive right to sell the units in a condominium complex. See 813 N.E.2d at 1127. The parties agreed to a damages clause, which stipulated that if the defendant revoked the plaintiff's sales authority, the plaintiff would be entitled to damages premised on unrealized commissions (calculated on the basis of the full price of unsold units). See id. After the defendant breached, he attacked the damages clause as an unenforceable penalty. In support, the defendant contended that the clause amounted to a "tremendous windfall" because the measure of damages assumed that every unit would sell at the list price and that the plaintiff would not have to split any commissions. Id. at 1133.

The court disagreed, holding that the clause was a valid and enforceable liquidated damages clause. See id. It explained that the defendant's breach deprived the plaintiff of "the opportunity to sell the units" and took away "any chance" that the plaintiff might have had of obtaining commissions on those units. Id. The possibility that other factors might have reduced the

---

last two Program Payments was excused only because Abbott had breached (that is, Abbott had made apparent that it would not do what was necessary to reach the Aggregate Spending Target). Seen in this light, Hancock's reduced contribution was the direct and foreseeable result of Abbott's underspending.

plaintiff's actual commissions had the defendant not breached only illustrated the difficulty of calculating actual damages at the time of contracting.  See id.

In this case, as in Jameson, the plaintiff (Hancock) was deprived of the opportunity for which it had bargained — the chance to reap the profits of a fully funded research program.  Any doubt about factors that might have reduced these profits only "prove the validity of the clause [by] show[ing] just how uncertain and difficult calculating actual damages was at the time of contracting."  Id.

Abbott's last argument strikes a similar chord.  It submits that damages should be smaller when the breach occurs earlier in the Program Term because Hancock will have avoided more costs.  This argument taps into the principle that a non-breaching party's damages generally ought to be reduced by the costs that the party avoids as a result of the breach.  See Sterling Freight Lines, Inc. v. Prairie Mat'l Sales, Inc., 674 N.E.2d 948, 951 (Ill. App. Ct. 1996); Levan v. Richter, 504 N.E.2d 1373, 1378 (Ill. App. Ct. 1987).

We acknowledge that, under Illinois law, Hancock's recovery should be based on its net lost profits, that is, the lost profits attributable to Abbott's underspending less Hancock's avoided costs.  See Sterling Freight, 674 N.E.2d at 951.  Section

- 48 -

3.3(b) does not make an explicit reference to avoided costs,[12] but the absence of such a reference is not problematic: since there is no sum certain representing Hancock's gross lost profits, Hancock's avoided costs cannot be subtracted from its gross lost profits (an unknowable figure) in a literal sense. Rather, in keeping with section 3.3(b)'s general principle of proportionality, the Agreement reasonably anticipates that the increased lost profits caused by an earlier breach will offset the greater avoided costs.

Abbott posits that a breach early in the Program Term should engender a smaller, not a larger, liquidated damages award because Hancock has avoided more costs. Yet Abbott conveniently overlooks the corresponding fact that the gross lost profits will almost certainly be higher for an earlier breach. Thus, the increased avoided costs are deducted from a larger gross profits number, resulting in higher damages.

---

[12] Section 3.3(b)'s silence regarding avoided costs does not necessarily mean that avoided costs are not factored into section 3.3(b)'s formula. Section 3.2 states that if Abbott "fail[s] to fund the Research Program in accordance with this [s]ection," Hancock's "sole and exclusive remedies" are "set forth in [s]ections 3.3 and 3.4." Inasmuch as the parties provided for both liquidated damages and the discharge of Hancock's future payment obligations, we may safely assume that they considered avoided costs in crafting section 3.3(b). Of course, we must still ask — as we have done supra — whether their estimate of damages in section 3.3(b) is reasonable.

As a counterpoint, consider a situation in which Abbott breaches late in the Program Term. Hancock may have less (or even no) avoided costs, but its lost profits will also be less. It follows that liquidated damages in such a case should be less even though Hancock's avoided costs are less.

There is an interrelated reason why it is logical that the liquidated damages would be greater when Hancock's avoided costs are greater. But for Abbott's breach (which triggered section 3.4), Hancock would have contributed more funds to the development of the Program Compounds. These additional funds would have spurred the development of the Program Compounds and likely would have increased their profitability. So, when Abbott breaches before Hancock has made all four of its Program Payments, Abbott doubly suppresses future profits: first, by underfunding its own obligations, and second, by shutting off the spigot so that additional funds from Hancock dry up.

The formula set out in section 3.3(b) may be an unorthodox way of accounting for avoided costs, but it is tailored to suit the idiosyncratic nature of the parties' relationship. Normally, avoided costs are a one-way ratchet. Take, for instance, a typical case. X, who has a factory in Massachusetts, enters into a contract with Y to manufacture and deliver widgets F.O.B. at Y's warehouse in Illinois. After the widgets are made but before they are shipped, Y notifies X that it will not honor the

contract.  When X sues for damages, the costs of transportation are avoided costs, that is, they are costs that X will not have to incur and, thus, they count, dollar for dollar, against what would otherwise have been X's damages.

Here, however, Hancock's lessened contributions are a different species of avoided costs: they are a two-way ratchet. While it is true that Hancock's costs are diminished by the fact that it is excused from making its third and fourth Program Payments, the diminished funding that results from that non-payment also diminishes Hancock's anticipated profits.  After all, it is a reasonable assumption that the more money that is made available for the development of the Program Compounds, the greater the anticipated profits will be.  Given the deference that we owe the parties' negotiated formula for estimating damages that are highly uncertain, see XCO Int'l, 369 F.3d at 1001-02, and the unique nature of the avoided costs at issue here, we do not think that we are at liberty to substitute our judgment for that of the contracting parties.

To sum up, the lost profits attributable to Abbott's underspending in the wildly speculative business of developing pharmaceutical drugs were uncertain and defied meaningful calculation at the time of contracting.  Recognizing this difficulty and intending to address it, Abbott and Hancock agreed to the formula contained in section 3.3(b) to provide a reasonable

estimate of damages in the event of a breach by Abbott of its spending obligation. We are confident that, on balance, section 3.3(b)'s formulaic estimate of those actual damages falls comfortably within the universe of reasonable estimates. See Inland Bank, 927 N.E.2d at 783. Abbott has not carried its burden of proving that section 3.3(b) is a penalty rather than a valid and enforceable liquidated damages provision, see XCO Int'l, 369 F.3d at 1003, and it must pay Hancock one-third of the Aggregate Carryover Amount as liquidated damages. According to the district court's calculations, which we see no need to revisit, that amount is $33,033,333.33.

## E. Rescission.

We need not linger long over Hancock's contention that the district court erred in striking its prayer for rescission. The doctrine of election of remedies prevents a party from seeking inconsistent remedies.

Applying this doctrine leads inexorably to the conclusion that a party may not both rescind a contract and recover damages for a breach of that contract. See Harris v. Manor Healthcare Corp., 489 N.E.2d 1374, 1381 (Ill. 1986). Those remedies are flatly inconsistent with each other: rescission is in essence a disavowal of the contract whereas recovery for a breach is in essence an affirmation of the contract. See Newton v. Aitken, 633 N.E.2d 213, 216 (Ill. App. Ct. 1994). To both rescind an

agreement and recover damages for a breach of that agreement would therefore be "inappropriate."  Id. at 217.  As a result, "[t]he election of either remedy is an abandonment of the other."  Id.

Here, Hancock has recovered damages under section 3.3(b) for Abbott's breach of section 3.2.  Enforcing section 3.3(b) implies an affirmance of the Agreement and, thus, is inconsistent with any right to rescission.[13]  Given this inescapable logic, we hold that Hancock may not now seek rescission of the Agreement. See Harris, 489 N.E.2d at 1381.  Consequently, the district court did not err in striking Hancock's prayer for rescission.

## F.  Prejudgment Interest.

In a diversity action, state law controls a prevailing party's entitlement to prejudgment interest.  See Comm'l Union Ins. Co. v. Walbrook Ins. Co., 41 F.3d 764, 774 (1st Cir. 1994). Conversely, federal law governs a party's entitlement to postjudgment interest.  See Vázquez-Filippetti v. Cooperativa de Seguros Múltiples de P.R., 723 F.3d 24, 28 (1st Cir. 2013); see also 28 U.S.C. § 1961 (providing for postjudgment interest on civil judgments in federal courts).

---

[13] The district court held that Hancock's pursuit of a declaratory judgment in Hancock I and Hancock II was inconsistent with Hancock's prayer for rescission.  See Hancock III, 183 F. Supp. 3d at 302-03.  That may be so, but we have no need to pursue the point.

Under Illinois law, "[p]rejudgment interest is proper when it is authorized by a statute, authorized by agreement of the parties, or warranted by equitable considerations." In re Marriage of O'Malley ex rel. Godfrey, 64 N.E.3d 729, 746 (Ill. App. Ct. 2016). Here, Hancock is entitled to prejudgment interest both by statute, see 815 Ill. Comp. Stat. 205/2, and by the terms of the Agreement, specifically section 9.3. As a practical matter, the only difference between the prejudgment interest contemplated by the Illinois statute and that available under the Agreement is the rate. The statutory rate is 5%. See id. The rate under the Agreement is the lesser of "the prime rate of interest plus two hundred (200) basis points" or "the highest rate permitted by applicable law."

When a prevailing party is entitled to prejudgment interest both under a statute and under a contractual provision, the prevailing party may recover prejudgment interest at the higher available rate. See Mich. Ave. Nat'l Bank v. Evans, Inc., 531 N.E.2d 872, 881 (Ill. App. Ct. 1988). On remand, the district court should calculate prejudgment interest either pursuant to the statute or pursuant to the Agreement (as Hancock may elect).

With respect to duration, "the beginning date for the accrual of postjudgment interest marks the ending date for the accrual of prejudgment interest." Old Second Nat'l Bank v. Ind. Ins. Co., 29 N.E.3d 1168, 1180 (Ill. App. Ct. 2015). To determine

that date, the weight of authority in diversity cases holds that federal law establishes when postjudgment interest begins to accrue and, thus, establishes when prejudgment interest ceases to accrue. See Art Midwest, Inc. v. Clapper, 805 F.3d 611, 615 (5th Cir. 2015); Coal Res., Inc. v. Gulf & W. Indus., Inc., 954 F.2d 1263, 1274 (6th Cir. 1992); Happy Chef Sys., Inc. v. John Hancock Mut. Life Ins. Co., 933 F.2d 1433, 1437-38 (8th Cir. 1991); Travelers Ins. Co. v. Transp. Ins. Co., 846 F.2d 1048, 1053-54 (7th Cir. 1988); Northrop Corp. v. Triad Int'l Mktg. S.A., 842 F.2d 1154, 1156-57 (9th Cir. 1988) (per curiam); cf. Fratus v. Republic W. Ins. Co., 147 F.3d 25, 29-30 (1st Cir. 1998) (applying Federal Rules of Civil Procedure and 28 U.S.C. § 1961 to determine date that postjudgment interest would begin to accrue in diversity suit). But cf. Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 146-47 (1st Cir. 2009) (suggesting different rule in non-diversity case).

Under federal law, "where a first judgment lacks an evidentiary or legal basis, post-judgment interest accrues from the date of the second judgment." Cordero v. De Jesus-Mendez, 922 F.2d 11, 16 (1st Cir. 1990). Because the district court's decision interpreting section 3.3(b) is entirely reversed, that portion of its judgment perforce lacked a legal basis. On remand, therefore, the district court should calculate prejudgment interest on this award beginning from the date that it was due under the Agreement

(thirty days after the end of 2005) and continuing until the date that the district court enters its amended judgment. Postjudgment interest will accrue from that date forward. See 28 U.S.C. § 1961; Kaiser Alum. & Chem. Corp. v. Bonjorno, 494 U.S. 827, 836 (1990).

The portion of the district court's judgment that awarded Hancock damages for Abbott's breach of the Agreement's audit provision in the amount of $198,731 was not appealed and remains in effect. If that portion of the judgment remains unsatisfied, it must be incorporated in the amended judgment, together with prejudgment interest to the date of the original judgment (as previously calculated by the district court). Postjudgment interest shall continue to accrue on that portion of the judgment from that date forward.

## III. CONCLUSION

Refined to bare essence, this is a case about keeping promises. Hancock and Abbott made promises to each other. Abbott nonetheless failed to honor several promises, including one important promise in particular. The parties had provided a damages remedy for just such an eventuality, and that remedy produced a rational estimate of Hancock's actual damages which, at the time of contracting, were highly uncertain and impossible to calculate. The remedy is, therefore, a valid liquidated damages clause, and Hancock is entitled to enforce it according to its tenor.

We need go no further.  For the reasons elucidated above, we reverse the judgment of the district court with respect to section 3.3(b) of the Agreement, affirm its dismissal of Hancock's prayer for rescission, and remand for further proceedings consistent with this opinion.  Costs shall be taxed in favor of Hancock.

**So Ordered.**